UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

COREY W.,

                              Plaintiff,

v.                                                          1:17-CV-0978
                                                            (TWD)
COMM'R OF SOC. SEC.,

                              Defendant.
_____

APPEARANCES:                                                OF COUNSEL:

COREY W.
  Plaintiff, *Pro se*
334B Main Street
Catskill, NY 12414

U.S. SOCIAL SECURITY ADMIN.                                 ELIZABETH D. ROTHSTEIN,
OFFICE OF REG'L GEN. COUNSEL – REGION II                    ESQ.
  Counsel for Defendant
26 Federal Plaza - Room 3904
New York, NY 10278

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## DECISION and ORDER

Currently before the Court, in this Social Security action filed by Corey W. ("Plaintiff")

against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to

42 U.S.C. §§ 405(g) and 1383(c)(3), are Plaintiff's motion for judgment on the pleadings and

Defendant's motion for judgment on the pleadings.  (Dkt. Nos. 15 and 16.)  For the reasons set

forth below, Plaintiff's motion for judgment on the pleadings is granted and Defendant's motion

for judgment on the pleadings is denied.

I.    RELEVANT BACKGROUND

A.    Factual Background

Plaintiff was born in 1969, making him 43 years old at the alleged onset date and 47

years old at the date of the ALJ's decision.  He reported completing the twelfth grade and has

previous work as a cook and a construction laborer.  At the initial application level, Plaintiff

alleged disability due to chronic low back pain with arthritis, bilateral hip bursitis, depression,

diabetes, and pain from a facture in the right hand.

B.    Procedural History

Plaintiff applied for a period of disability and disability insurance benefits as well as

Supplemental Security Income on March 14, 2014, alleging disability beginning May 7, 2012.

His applications were initially denied on June 10, 2014, after which he timely requested a

hearing before an Administrative Law Judge ("ALJ").  Plaintiff appeared at an administrative

hearing before ALJ Arthur Patane on March 11, 2016.  (T. 38-54.)[1]  On April 15, 2016, the ALJ

issued a written decision finding Plaintiff was not disabled under the Social Security Act.  (T. 17-

37.)  On June 30, 2017, the Appeals Council denied Plaintiff's request for review, making the

ALJ's decision the final decision of the Commissioner.  (T. 1-6.)

C.    The ALJ's Decision

The ALJ made the following findings of fact and conclusions of law.  (T. 22-33.)  First,

the ALJ found Plaintiff met the insured status requirements of the Social Security Act through

March 31, 2015, and did not engage in substantial gainful activity since May 7, 2012, the alleged

---

[1]       The Administrative Transcript is found at Dkt. No. 8.  Citations to the Administrative
Transcript will be referenced as "T." and the Bates-stamped page numbers as set forth therein
will be used rather than the page numbers assigned by the Court's CM/ECF electronic filing
system.

onset date. (T. 22.) The ALJ also found Plaintiff's mild degenerative disc disease ("DDD") and spondylosis of the lumbosacral and cervical spine, hip and shoulder bursitis, and affective disorder are severe impairments. (T. 22-23.) Next, the ALJ found Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § 404, Subpart P, App. 1 (the "Listings"), and specifically considered Listings 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine), 12.04 (affective disorders), and 12.09 (substance addiction disorders). (T. 23-24.) The ALJ then found Plaintiff has the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c) "except he can have frequent but not constant contact with the general public with no other mental or physical limitations." (T. 24-31.) Finally, the ALJ found Plaintiff is capable of performing past relevant work as a cook and is also capable of performing other jobs existing in significant numbers in the national economy. (T. 31-33.) The ALJ therefore concluded Plaintiff is not disabled.

### D. The Parties' Briefings on Their Cross-Motions

#### 1. Plaintiff's Motion for Judgment on the Pleadings

Plaintiff was initially represented in this action by Peter M. Margolius, Esq. (Dkt. No. 1.) Following Mr. Margolius' death, the deadline for the filing of Plaintiff's brief was stayed by the Court and the Court instructed Plaintiff to advise whether he would be proceeding *pro se* or retaining new counsel to represent him. (Dkt. No. 9.) On January 29, 2018, Plaintiff advised the Court via letter that he would be proceeding *pro se* in this case. (Dkt. No. 10.) On January 30, 2018, Plaintiff was mailed the *pro se* handbook and notice, a copy of the Local Rules, the Lawyer Referral List, and General Order #18. (Dkt. No. 11.) On March 23, 2018, Plaintiff filed a brief in support of his motion for judgment on the pleadings. (Dkt. No. 15.)

Plaintiff generally argues the ALJ's RFC determination is not supported by substantial evidence. (Dkt. No. 15 at 2-4.) He contends the ALJ improperly rejected the medical opinions of all three acceptable medical sources contained in the record consisting of consultative examiner Joseph Prezio, M.D., consultative examiner Mena Stramenga, Ph.D., and non-examining consultant Dr. T. Bruni. (*Id*. at 3.) Plaintiff points to Dr. Prezio's examination and medical evidence supporting his opinion including an orthopedic examination, treatment notes, a thoracic x-ray which showed anterior wedging, loss of lordosis, and acute dyphosis of 21 degrees at T12, and a cervical MRI showing multi-level but relatively mild cervical spondylosis. (Dkt. No. 15 at 3; T. 276, 285, 403-04.)

Plaintiff also notes Dr. Stramenga's mental status examination and opinion indicating moderate difficulties maintaining attention and concentration, moderate-to-marked difficulties maintaining a regular schedule, moderate difficulties learning new tasks, marked difficulties performing complex tasks independently, moderate difficulties making appropriate decisions, moderate difficulties relating adequately with others, and marked difficulties appropriately dealing with stress. (Dkt. No. 15 at 3-4; T. 321.) Additionally, Plaintiff points to Dr. Bruni's assessment indicating moderate limitations in the ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, and travel in unfamiliar places or use public transportation. (Dkt. No. 15 at 4; T. 64-66.) Plaintiff argues these opinions are supported by treatment records from Greene County Mental Health documenting a diagnosis of major depressive disorder (recurrent, severe) with psychotic features and a continuous global assessment of functioning ("GAF") score of 45. (Dkt. No. 15 at 4; T. 355-93.)

## 2.     Defendant's Motion for Judgment on the Pleadings

In support of her motion for judgment on the pleadings, Defendant makes two arguments indicating the ALJ properly evaluated the medical opinion evidence and substantial evidence supports the ALJ's RFC finding.  (Dkt. No. 16 at 3-15.)  First, Defendant argues the ALJ properly weighed Dr. Prezio's opinion and rejected this opinion for several reasons, including that it appeared Dr. Prezio relied substantially on Plaintiff's subjective reports and that Dr. Prezio's opinion was not consistent with Plaintiff's limited specialized treatment history, mild or absent abnormalities on laboratory diagnostic imaging, and repeatedly unremarkable physical examinations.  (*Id*. at 4-7.)  Defendant also argues that, even if the ALJ had given great weight to Dr. Prezio's opinion, this would not have altered the ALJ's decision because the RFC finding for medium work included the capacity to perform light and sedentary work and the opinion remains plainly consistent with the capacity to perform light and sedentary work even if it was viewed as inconsistent with the capacity to perform medium work.  (*Id*. at 6-7.)  Therefore, the ALJ's Step Five finding would remain unchanged, as there is little or no effect on the occupational bases of unskilled light and sedentary work.  (*Id*. at 7.)  Additionally, Defendant contends substantial evidence supports the ALJ's RFC finding for medium work, including light and sedentary work. (*Id*.)

Defendant also argues the ALJ properly weighed the opinions from Dr. Stramenga and Dr. Bruni.  (*Id*. at 8-15.)  Defendant notes much of Dr. Stramenga's opinion supports the ALJ's RFC finding and the ALJ properly gave little weight to the remainder of this opinion because it was not well-supported by Dr. Stramenga's relatively unremarkable one-time consultative examination and was based on Plaintiff's subjective complaints, which were contradicted by the largely normal mental status examinations in the treatment records.  (*Id*. at 8-12.)

Defendant argues the ALJ properly gave greater weight to Dr. Bruni's opinion and notes that Plaintiff points to the worksheet portions of Dr. Bruni's assessment suggesting he was moderately limited in several itemized areas of functioning rather than Dr. Bruni's actual opinion. (*Id*. at 12-13.) The majority of Dr. Bruni's opinion, including the final narrative section where the actual mental RFC assessment is recorded, supports the ALJ's RFC finding for frequent but not constant contact with the general public and is consistent with the unskilled occupations identified at Steps Four and Five. (*Id*. at 13.) Defendant also notes the opinion of Dr. Bruni, as a psychological consultant, can constitute substantial evidence supporting the ALJ's findings where, as here, it is supported by the evidence in the record as a whole. (*Id*. at 13-14.) Defendant contends, however, that the ALJ properly gave reduced weight to the portion of Dr. Bruni's opinion relating to Plaintiff's ability to deal with coworkers, which indicates he could have brief and superficial contact with them, because this was based almost entirely on Dr. Stramenga's opinion. (*Id*. at 14.) Dr. Bruni also overstated work-related limitations when considering Plaintiff's unremarkable mental status notes from Columbia Memorial Hospital and Columbia Memorial Health as well as his unremarkable mental health treatment notes once he started outpatient therapy with Greene County Mental Health Center. (*Id*.)

## II.     RELEVANT LEGAL STANDARD

### A.     Standard of Review

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. 42 U.S.C. § 405(g); *Wagner v. Sec'y of Health & Human Servs*., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will be reversed only if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for

doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *accord Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983), *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

**B.     Standard to Determine Disability**

The Commissioner has established a five-step evaluation process to determine whether an

individual is disabled as defined by the Social Security Act.  20 C.F.R. §§ 404.1520, 416.920.

The Supreme Court has recognized the validity of this sequential evaluation process.  *Bowen v.*

*Yuckert*, 482 U.S. 137, 140-42 (1987).  The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.  If he is not, the
> [Commissioner] next considers whether the claimant has a "severe
> impairment" which significantly limits his physical or mental ability
> to do basic work activities.  If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed in
> Appendix 1 of the regulations.  If the claimant has such an
> impairment, the [Commissioner] will consider him disabled without
> considering vocational factors such as age, education, and work
> experience; the [Commissioner] presumes that a claimant who is
> afflicted with a "listed" impairment is unable to perform substantial
> gainful activity.  Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's
> severe impairment, he has the residual functional capacity to
> perform his past work.  Finally, if the claimant is unable to perform
> his past work, the [Commissioner] then determines whether there is
> other work which the claimant could perform.  Under the cases
> previously discussed, the claimant bears the burden of the proof as
> to the first four steps, while the [Commissioner] must prove the final
> one.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *accord McIntyre v. Colvin,* 758 F.3d 146,

150 (2d Cir. 2014).  "If at any step a finding of disability or non-disability can be made, the SSA

will not review the claim further."  *Barnhart v. Thompson,* 540 U.S. 20, 24 (2003).

**III.     ANALYSIS**

**A.     The ALJ's Analysis of the Opinion Evidence and Plaintiff's RFC is Not
           Supported by Substantial Evidence**

The Second Circuit has long recognized the "treating physician rule" set out in 20 C.F.R.

§§ 404.1527(c), 416.927(c).  "[T]he opinion of a claimant's treating physician as to the nature

and severity of the impairment is given 'controlling weight' so long as it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.'" *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)). However, there are situations where the treating physician's opinion is not entitled to controlling weight, in which case the ALJ must "explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Greek*, 802 F.3d at 375 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013)). The factors for considering opinions from non-treating medical sources are the same as those for assessing treating sources, with the consideration of whether the source examined the claimant or not replacing the consideration of the treatment relationship between the source and the claimant. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

RFC is defined as "what an individual can still do despite his or her limitations . . . . Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (quoting *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999)). "In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee*, 631 F. Supp. 2d at 210 (citing 20 C.F.R. § 404.1545(a)). "Ultimately, '[a]ny impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment.'" *Hendrickson v. Astrue*, 11-CV-0927 (ESH), 2012 WL 7784156, at *3 (N.D.N.Y.

Dec. 11, 2012) (quoting Social Security Ruling ("SSR") 85-15, 1985 WL 56857, at *8). The RFC determination "must be set forth with sufficient specificity to enable [the Court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

### B. The ALJ's Analysis of the Opinion Evidence

In May 2014, Dr. Prezio conducted a consultative internal medicine examination of Plaintiff and noted Plaintiff appeared to be in no acute distress. (T. 310-16.) Plaintiff reported using marijuana quite a bit and that it eased his pain. (T. 311.) On examination, Dr. Prezio noted Plaintiff had a normal gait and stance, could walk on his heels and toes without difficulty, he had a full squat, used no assistive device, needed no help changing for the exam or getting on and off the exam table, and was able to rise from a chair without difficulty. (T. 312.) He had a full range of motion in the cervical spine, some restriction of range of motion in the lumbar spine, definite point tenderness over the mid-to-lower lumbar spine radiating to both regions of the sacroiliac joints with a moderate degree of paralumbar spasm, no hip pain noted on palpation or during these maneuvers, and negative straight leg raising testing bilaterally. (T. 313.) He had full range of motion of the bilateral shoulders, elbows, forearms, wrists, hips, knees and ankles, physiologic and equal deep tendon reflexes in the upper and lower extremities, no noted sensory deficits, full strength in the upper and lower extremities, and intact hand and finger dexterity with full grip strength bilaterally. (*Id.*) An x-ray of the right hand showed a status-post fracture of the fifth metacarpal and degenerative joint disease in the third and fourth DJP points. (T. 313, 316.)

Dr. Prezio diagnosed low back pain most likely due to DDD in the lower lumbar spine, diabetes mellitus type 2, and depression by history. (T. 313.) He opined that Plaintiff had a mild

restriction with respect to engaging in any prolonged standing, walking, squatting, kneeling, bending, doing any heavy lifting, or carrying objects of any significant weight in view of the findings noted in the lumbar spine at the time of the examination.  (T. 313-14.)

When assessing Plaintiff's RFC, the ALJ noted the record contained no treating opinions, but that Plaintiff had attended a consultative examination with Dr. Prezio.  (T. 29-30.)  In discussing Dr. Prezio's examination and opinion, the ALJ noted Plaintiff asserted he had no history of radiographs until that day and that, while this appeared to be true, he had an unremarkable MRI study of the lumbar spine the month prior and did not appear to have informed Dr. Prezio of this fact.  (T. 29-30.)  The ALJ indicated that Dr. Prezio's review of radiographs taken that day showed no significant bony abnormality in the lumbosacral spine. (*Id*.)  The ALJ afforded little weight to most of Dr. Prezio's opinion because repeated clinical testing had not revealed spasm as observed by Dr. Prezio, and because it appeared Dr. Prezio relied substantially on Plaintiff's subjective reports.  (*Id*.)  The ALJ noted Plaintiff's very limited specialized treatment history, mild or absent abnormalities on laboratory diagnostic imaging, and repeatedly unremarkable physical examinations regarding gait, stance, ranges of motion, strength, sensory findings, and reflexes.  (T. 29-30.)  The ALJ indicated that the RFC finding was consistent with Plaintiff's benign or absent objective abnormalities in treatment notes and the weight restrictions in the RFC were supported only when affording extreme deference to Plaintiff's poorly substantiated testimony and complaints.  (T. 30.)  The ALJ also noted that Plaintiff had been recorded in primary care notes as asserting good control of his physical pain without medication side effects.  (*Id*.)

In May 2014, Plaintiff also underwent a consultative psychiatric examination conducted by Dr. Stramenga.  (T. 317-22.)  Plaintiff reported using marijuana daily and endorsed depressive

symptomology including dysphoric moods, crying spells, loss of usual interest, irritability, fatigue, diminished self-esteem, social withdrawal and recurrent thoughts of suicide as well as anxiety-related symptomology including excessive apprehension and worry, feeling easily fatigued, irritability, difficulty concentrating, flashbacks, and panic attacks which occurred roughly twice a week with palpitations and sweating.  (T. 319.)  Dr. Stramenga noted Plaintiff was cooperative and related in an adequate manner; his thought process was coherent and goal-directed; he had a depressed affect, dysthymic mood, impaired attention and concentration due to anxiety and nervousness in the evaluation; he had emotional distress resultant to depression and anxiety; he had mildly impaired recent and remote memory skills due to similar reasons; and he had fair insight, and good judgment.  (T. 319-20.)

Dr. Stramenga diagnosed major depressive disorder with recurrent episodes, unspecified anxiety disorder, substance abuse disorder, and the need to rule out panic attacks and posttraumatic stress disorder.  (T. 321.)  She opined Plaintiff could follow and understand simple directions and instructions and perform simple tasks independently.  (*Id*.)  She also opined he had moderate difficulties maintaining attention and concentration, learning new tasks, making appropriate decisions and relating adequately with others, moderate-to-marked difficulties maintaining a regular schedule, and marked difficulties performing complex tasks independently and appropriately dealing with stress.  (*Id*.)  Dr. Stramenga noted these difficulties appeared to be caused by issues related to a mood disorder and the results of the evaluation appeared to be consistent with psychiatric problems that might significantly interfere with Plaintiff's ability to function on a daily basis.  (*Id*.)  She indicated Plaintiff would need assistance in managing funds due to self-reported difficulties.  (*Id*.)

In June 2014, as part of the initial evaluation process, non-examining State agency medical consultant T. Bruni opined that Plaintiff had a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation of extended duration. (T. 61-62, 64-66, 74-75, 77-79.) Dr. Bruni indicated the data supported the presence of a significant psychiatric impairment resulting in some functional limitation, but that Plaintiff retained the ability to understand and remember simple instructions and procedures and maintain adequate attention and concentration to complete work-like procedures and sustain a routine. (T. 66, 79.) Dr. Bruni opined Plaintiff's ability to deal with coworkers and the public would be somewhat reduced, but adequate enough to handle brief and superficial contact and ordinary levels of supervision in the customary work setting and Plaintiff exhibited some difficulty with adaptation, but was able to cope with basic changes and make routine decisions. (*Id*.)

In his decision, the ALJ found that Plaintiff had no restriction of activities of daily living, moderate difficulties in social functioning, mild difficulties with regard to concentration, persistence or pace, and no episodes of decompensation. (T. 23-24.) When assessing Plaintiff's RFC, the ALJ noted incongruent GAF scores and the lack of treating opinions regarding mental limitations. (T. 30.) The ALJ indicated Plaintiff's treatment notes were inconsistent with more than minimal limitations in basic mental work activities. (*Id*.) The ALJ also indicated there was strong support in the record for a finding of a non-severe mental impairment, but noted he found mental limitations when affording extreme deference to Plaintiff's poorly substantiated subjective complaints. (*Id*.)

The ALJ afforded little consideration to Dr. Stramenga's "anomalous findings [relating to anxiety] because they are grossly at odds with the treatment notes of record and [Plaintiff's]

treating sources never diagnosed an anxiety disorder." (T. 30.) The ALJ noted that Dr.

Stramenga's opinion directly relied on Plaintiff's subjective complaints, which were poorly

substantiated in the medical record, despite a relatively unremarkable mental status evaluation.

(T. 30.) The ALJ indicated Dr. Stramenga's opinion was contradicted by Plaintiff's mental

status notes showing consistently normal mood, attention, memory, insight, judgment, speech,

motor behavior, eye contact, and manner of relating, and also noted Plaintiff reported twice-

weekly panic attacks which were not reflected in his reports to treating sources or corroborated

by objective evidence. (T. 30-31.)

The ALJ indicated Dr. Bruni relied almost entirely on Dr. Stramenga's notes and opinion

because Plaintiff had yet to start outpatient therapy. (T. 31.) The ALJ afforded greater weight to

Dr. Bruni's opinion of moderate social limitations and no more than mild mental difficulties with

activities of daily living and concentration, persistence or pace though the opinion still appeared

to overstate work-related limitations when considering Plaintiff's unremarkable mental status

notes from primary care, both before and after the two consultative opinions, as well as

Plaintiff's unremarkable mental status notes once he started outpatient therapy. (*Id.*)

C.    **The Court's Analysis**

Plaintiff argues the ALJ erred in weighing the medical opinions of record and the RFC

determination is not supported by substantial evidence. (Dkt. No. 15 at 2-4.) The Court agrees.

First, while the ALJ's decision, and the RFC analysis in particular, appears detailed on its

face, the ALJ's mental RFC determination lacks sufficient explanation for the weight afforded to

Dr. Bruni's non-examining opinion and, by association, Dr. Stramenga's opinion. Specifically,

the ALJ purported to afford "greater" weight to Dr. Bruni's opinion of moderate social

limitations and no more than mild mental difficulties with activities of daily living and

concentration, persistence or pace while simultaneously acknowledging that Dr. Bruni relied almost entirely on Dr. Stramenga's notes and opinion which the ALJ found to be unsupported. (T. 30-31.) Indeed, the ALJ acknowledged that, despite affording greater weight to these certain portions of Dr. Bruni's opinion, the opinion still appeared to overstate work-related limitations. (T. 31.) Rather than offering a logical bridge between the opinion evidence and Plaintiff's mental RFC, the ALJ's RFC determination for frequent but not constant contact with the general public is not supported since neither Dr. Bruni or Dr. Stramenga's opinion is consistent with that finding. *See Hickman ex rel. M.A.H. v. Astrue*, 728 F. Supp. 2d 168, 173 (N.D.N.Y. 2010) ("The ALJ must 'build an accurate and logical bridge from the evidence to [his] conclusion to enable a meaningful review.'") (quoting *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)). Therefore, the Court cannot conclude that the ALJ's RFC analysis of the opinions pertaining to Plaintiff's mental limitations and resulting RFC determination are supported by substantial evidence.

Second, the issues indicated above are not sufficiently addressed by the ALJ's subsequent statements that he weighed the "overstated mental health opinions" with Plaintiff's weak mental health treatment history, unremarkable mental status evaluations, absence of any emergency mental health care, and Plaintiff's assertions to providers that medications managed his moods without side effects to support the mental RFC. (T. 31.) Generally, it is within an ALJ's purview to weigh the evidence of record and resolve any conflicts therein. *See Bliss v. Colvin*, 13-CV-1086 (GLS/CFH), 2015 WL 457643, at *7 (N.D.N.Y. Feb. 3, 2015) ("It is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such."); *accord Petell v. Comm'r of Soc. Sec.*, 12-CV-1596 (LEK/CFH), 2014 WL 1123477, at *10 (N.D.N.Y. Mar. 21, 2014). However, the ALJ's overall decision here

does not provide sufficient explanation for his puzzling analysis of Dr. Bruni's opinion and the ALJ's statement that he afforded it greater weight although it relied heavily on an opinion he found to be unsupported. (T. 31.)

Finally, because remand is necessary for the reasons noted above and the ALJ will be required to address such deficiencies in considering the opinion evidence relating to Plaintiff's mental limitations and mental RFC, the Court declines to reach a finding regarding Plaintiff's argument pertaining to the ALJ's analysis of Dr. Prezio's opinion and Plaintiff's physical RFC. (Dkt. No. 15 at 3.) Nevertheless, this portion of the ALJ's analysis is similarly concerning. The ALJ indicated his findings that Plaintiff could sit, stand, and walk without limitations, and lift, carry, push, and pull up to 50 pounds occasionally and 25 pounds with no exertional physical limitations were consistent with Plaintiff's benign or absent objective abnormalities in treatment notes and the weight restrictions were supported only when affording extreme deference to Plaintiff's poorly substantiated testimony and complaints. (T. 30.) The ALJ also indicated that he afforded "little weight to most of Dr. Prezio's opinion" because repeated clinical testing had not revealed the spasm observed by Dr. Prezio and because it appeared that Dr. Prezio relied substantially on Plaintiff's subjective reports. (T. 29.) However, Dr. Prezio's opinion is the sole acceptable medical source opinion pertaining to Plaintiff's physical limitations. Because the ALJ afforded little weight to most of that opinion, the Court finds the evidence supporting the ALJ's RFC for medium work is lacking.[2] For this reason, the ALJ should also provide a new analysis pertaining to Plaintiff's physical RFC on remand.

---

[2]     The Court notes that the ALJ's physical RFC determination appears to be consistent with the RFC assessment of Single Decision Maker J. Christian at the time of the June 2014 initial determination, though it appears the ALJ does not address this assessment in his decision. (T. 20-33, 63-64, 68-69, 76-77, 80-82.)

For the reasons above, the Court finds the ALJ's consideration of the opinion evidence and resulting RFC determination are not supported by substantial evidence.  Remand is therefore required on this basis.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 15) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Defendant's motion for judgment on the pleadings (Dkt. No. 16) is **<u>DENIED</u>**; and it is further

**ORDERED** that Defendant's decision denying Plaintiff benefits is **<u>VACATED</u>**, and this case is **<u>REMANDED</u>**, pursuant to Sentence Four of 42 § U.S.C. 405(g) for proceedings consistent with this Decision and Order; and is it further

**ORDERED** that Clerk provide Plaintiff with a copy of this Decision and Order, along with a copy of the unpublished decision cited herein.


Dated:  December 27, 2018
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

2012 WL 7784156
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Ray HENDRICKSON, Plaintiff,

v.

Michael J. ASTRUE, Commissioner of the
Social Security Administration, Defendant.

Civil Action No. 5:11–927.
|
Dec. 11, 2012.

*REPORT AND RECOMMENDATION*

EARL S. HINES, United States Magistrate Judge.

**\*1** Plaintiff Kenneth Ray Hendrickson ("Hendrickson")
brings this action under 42 U.S.C. § 405(g) for review
of a decision denying his application for disability-based
benefits under the Social Security Act. Complying with
General Order # 18, the parties join issues through
competing briefs. [1]

[1]     General Order # 18 is dated September 23, 2003
         (superseding January 24, 2002 and September 19,
         2001 general orders). (Dkt. No. 3).

**I. Background**

Hendrickson applied for disability insurance ("DIB") and
supplemental security income ("SSI") benefits claiming
disability due to *depression* and *anxiety.* (T. 106–13,
136). [2] His applications, filed on June 25, 2007, alleged
that disability commenced on April 28, 2007. *Id.* After
being denied benefits initially (T. 66–67), Hendrickson
requested a hearing before an administrative law judge
("ALJ"). (T. 76).

[2]     "T." followed by a number refers to the page of the
         administrative

ALJ Thomas John S. Pope ("ALJ Pope") conducted a
video evidentiary hearing on September 10, 2009. (T. 19,
29–65). Hendrickson was represented by counsel, Jason
Mintz, Esq., at the hearing. (T. 19, 29, 31). Hendrickson

and an impartial vocational expert gave testimony. [3]
ALJ Pope received additional evidence consisting of
Hendrickson's medical records, a psychiatric evaluation of
a state agency psychiatric consultative examiner, Kristen
Barry, Ph.D., and a psychiatric review report and mental
residual functional capacity assessment of a state agency
psychology medical consultant, E. Kamin, Ph.D.

[3]     ALJ Pope presided over the hearing from
         Chicago, Illinois. Hendrickson appeared and testified
         through interactive video in Syracuse, New York.
         The impartial vocational expert, Edward Pagella,
         appeared by telephone. (T. 19).

When ALJ Pope denied Hendrickson's applications (T.
19–28), Hendrickson appealed to the Appeals Council of
the Social Security Administration's Office of Hearings
and Appeals. (T. 13–14). On June 28, 2011, the Appeals
Council denied Hendrickson's request to review. (T. 3–5).
This rendered ALJ Pope's opinion the final decision. *See
Sims v. Apfel,* 530 U.S. 103, 107 (2000).

Represented by new counsel, Howard D. Olinsky, Esq.,
Hendrickson timely instituted this case on August 4, 2011.
(Dkt. No. 1).

**II. Preliminary Discussion**

An initial discussion of the Social Security benefit
programs at issue and the administrative decision-
making process (including certain terms of art) will aid
comprehension of Hendrickson's underlying claim, ALJ
Pope's decision and Hendrickson's challenges thereto.

*A. Eligibility for Benefits*
*Disability Insurance benefits,* authorized by Title II of
the Social Security Act and funded by social security
taxes, provide income to insured individuals forced into
involuntary, premature retirement by reason of disability.
*Supplemental Security Income* benefits, authorized by
Title XVI of the Social Security Act and funded by general
tax revenues, provide an additional resource to assure
that disabled individuals' income does not fall below the
poverty line.

Maximum benefits available under SSI are considerably
less than under DIB. Here, ALJ Pope found that
Hendrickson meets the insurance requirements of the

DIB program. The practical effect of that finding makes Hendrickson's SSI application superfluous since Hendrickson, if found to be disabled, obviously would elect the higher benefit available under DIB.

**\*2** The Social Security Act defines disability as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3).

*B. Sequential Evaluation Procedure*

The law requires *individualized* determinations. *See Heckler v. Campbell,* 461 U.S. 458, 467 (1983). Hence, Commissioner Astrue generally must make both medical and vocational assessments in every case. To satisfy this requirement, the Commissioner utilizes a five-step, sequential evaluation procedure for adjudicating disability-based claims. *See* 20 C.F.R. §§ 404.1520(a), 416.920.[4] This model is "sequential" in the sense that when a decision can be made at an early step, remaining steps are not considered. *See* 20 C.F.R. §§ 404.1520, 416.920. It enjoys judicial approval as a fair and just way for determining disability applications in conformity with the Social Security Act. *See Bowen v. Yuckert,* 482 U.S. 137, 153 (1987) (citing *Heckler,* 461 U.S. at 461) (use of the sequential evaluation process "contribute[s] to the uniformity and efficiency of disability determinations")).

[4]     In this circuit, the Commissioner's five-step sequential procedure is described as follows:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment [that meets or equals a] listed [impairment] in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Shaw v. Chater,* 221 F.3d 126, 132 (2d Cir.2000) (citing *DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998) (citing 20 C.F.R. §§ 404. 1520, 416.920)).

Claimants bear the burden to prove their disability under the first four steps. *DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998). When they do, a *prima facie* case of disability has been proven. *See Mimms v. Heckler,* 750 F.2d 180, 185 (2d Cir.1984). The burden then shifts to the Commissioner in Step 5 to show "that there is work in the national economy that the claimant can do." *Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir.2009); *see also DeChirico,* 134 F.3d at 1180; *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); 20 C.F.R. § 416.966.

Specialized rules—some imposed externally by courts—govern the Commissioner's applications of these five steps. Those particularly pertinent to Hendrickson's case are described in the remainder of this section:

*1. Step 2 Severity Determination*

In the Commissioner's view, "[a] 'severe' impairment is one that significantly limits an individual's physical or mental ability to do 'basic work activities.' " *Meadors v. Astrue,* 370 Fed. App'x 179, 182 (2d Cir.2010) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)); *Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003); *see also* 20 C.F.R. § 416.921(b) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities"). The phrase "significantly limits," however, is not tantamount to an ultimate determination of disability. In this circuit, a Step 2 severity inquiry serves only to "screen out *de minimis* claims." *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995). Consequently, "[a] finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' ... [with] ...'no more than a minimal effect on an individual's ability to work.' " *Rosario v. Apfel,* No. 97 CV 5759, 1999 WL 294727, at \*5 (E.D.N.Y. Mar. 19, 1999) (quoting *Bowen,* 482 U.S. at 154 n. 12).

**\*3** When mental impairments are present, determining severity thereof is a complex undertaking. The Commissioner has promulgated additional regulations that require application of a "special technique" at the second (and third) steps of the five-step framework. *Kohler v. Astrue,* 546 F.3d 260, 265 (2d Cir.2008) (citing 20 C.F.R. § 404.1520a). This technique requires an initial determination of whether the claimant has a "medically determinable mental impairment." 20 C.F.R. § 404.1520a(b)(1). If so, the reviewing authority must then rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c), § 404.1520a(b)(2), which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) *concentration, persistence, or pace* (underscored because of relevance to instant case); and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). When the degree of limitation in each of the first three areas is rated "mild" or better, and no episodes of decompensation are identified, the claimant's mental impairment is not "severe." 20 C.F.R. § 404.1520a(d)(1). [5] Conversely, when a mental impairment is severe, evaluation proceeds to Step 3 to determine whether the impairment meets or is equivalent in severity to any listed mental disorder. 20 C.F.R. § 404.1520a(d)(2)(3).

[5]    "[A]pplication of the special technique [must] be documented." *Petrie v. Astrue,* 412 Fed. App'x 401, 408 (2d Cir.2011) (citing 20 C.F.R. § 404.1520a(e)). "Generally, a medical or psychological consultant will complete a standard document, known as a 'Psychiatric Review Technique Form' ("PRTF")." *Id.* "Pursuant to the regulations, the ALJ's written decision must 'reflect application of the technique, and ... include a specific finding as to the degree of limitation in each of the [four] functional areas." ' " *Id.* (quoting 20 C.F.R. § 404.1520a(e)(2)).

2. *Step 4 Residual Functional Capacity Determination*
When making a Step 4 finding (as to whether a severely impaired claimant can perform past relevant work), an ALJ must first assess and articulate that claimant's "residual functional capacity" ("RFC"), *i.e.,* what that claimant can still do in a work setting (8 hours a day, 5 days a week, or equivalent scheduled) despite physical and/or mental limitations caused by impairments and any relevant symptoms, such as pain. *See* 20 C.F.R. § 404.1545, 416.945(a); *see also Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (defining RFC). Administrative law judges thus decide whether applicants, notwithstanding their impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis. *See* SSR 96–p, TITLE II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 61 Fed.Reg. 34474, 1996 WL 374184, at \*4 (SSA July 2, 1996).

When *physical* impairments are at issue, the Commissioner's regulation and an internal policy ruling (a) identify various ordinary physical functions to be considered in context of an ordinary work schedule, (b) require function-byfunction assessments of those activities, and (c) dictate that the ultimate RFC determination account for limitations imposed by both severe and non-severe impairments. *See* 20 C.F.R. §§ 404.1545(a)(2), 404.1545(b), 416.945(a)(2), 416.945(b); SSR 96–8p, 1996 WL 374184, at \* \*5, 7.

When *mental* impairments are in the picture, the RFC assessment ("mental RFC") involves an even more detailed analyses of claimants' functional limitations than were undertaken at Step 2. Mental RFC consists of four broad categories (*i.e.,* understanding and memory; sustained concentration and persistence; social interaction; and adaptation) with a total of twenty subparts that are each reviewed and rated (*i.e.,* "not significantly limited"; "moderately limited"; "markedly limited"; "no evidence of limitation in this category"; and "not ratable on available evidence"). (T. 389–391). Ultimately, "[a]ny impairment-related limitations created by an individual's response to demands of work ... must be reflected in the RFC assessment." SSR 85–15, THE MEDICAL–VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS, 1985 WL 56857, at \*5–6 (SSA 1985).

3. *Step 5 Evidentiary Burden When Nonexertional Impairments Exist*
**\*4** At Step 5, the Commissioner can satisfy his burden to show that a claimant can still do work existing in the national economy by eliciting or consulting several extrinsic sources of relevant evidence. [6] In limited circumstances, moreover, the Commissioner may take administrative notice of disability *vel non* by adopting

findings published in *"Medical–Vocational Guidelines,"* commonly called *"the grids." See Roma v. Astrue,* 468 Fed. App'x 16, 20–21 (2d Cir.2012); *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2. When only exertional impairments [7] are in play, and when an ALJ's findings of residual functional capacity, age, education, and previous work experience coincide with grids parameters, the Commissioner may directly apply the grids to determine whether work exists in the national economy which claimants can perform. *See Martin v. Astrue,* 337 Fed. App'x 87, 91 (2d Cir.2009); *see also* 20 C.F.R. Part 404, Subpart P, Appendix 2; *see also Thompson v. Barnhart,* 75 Fed. App'x 842, 844 (2d Cir.2003) (Commissioner can meet Step 5 burden "by resorting to the applicable medical-vocational guidelines (the grids)"). [8]

[6]  Generally, the Commissioner elicits or consults two principal sources of evidence relevant to whether claimants can perform alternative, available work. First, witnesses qualified as "Vocational Experts" may testify as to whether jobs exist for a person with the claimant's precise abilities. *See* 20 C.F.R. §§ 404.1566(e), 416. 966(e); *see also* SSR 00–4p, POLICY INTERPRETATION RULING: TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE, AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS, 2000 WL 1898704, at *1–2 (SSA Dec. 4, 2000). Second, a United States Department of Labor publication titled *Dictionary of Occupational Titles* ("DOT") can assist in determining when a claimant's residual work skills can be used in other work and the specific occupations in which they can be used. *See* 20 C.F.R. §§ 404.1560(d)(1), 416.966(d)(1); *see also* SSR 00–4p, 2000 WL 1898704, at *1–2.

[7]  "An exertional impairment is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet ... strength demands of jobs (*i.e.,* sitting, standing, walking, lifting, carrying, pushing, and pulling)." *Bogardus–Fry v. Astrue,* No. 7:11–CV–883 (MAD), 2012 WL 3779132, at *15 n.14 (N.D.N.Y. Aug. 31, 2012) (citing 20 C.F.R. §§ 404.1569a(b), 416.969a(b); *Rodriguez v. Apfel,* No. 96 Civ. 8330(JGK), 1998 WL 150981, at *10, n.12 (S.D.N.Y. Mar. 31, 1998)).

[8]  The grids are a matrix of general findings—established by rule—as to whether work exists in

the national economy that a person can perform. "The grids take into account a claimant's RFC, as well as [his] age, education, and work experience." *Calabrese v. Astrue,* 358 Fed. App'x 274, 276 & n.1 (2d Cir.2009) (citing *Rosa v. Callahan,* 168 F.3d 72, 78 (2d Cir.1999)). Ultimately, the grids yield a decision of "disabled" or "not disabled." *Zorilla v. Chater,* 915 F.Supp. 662, 667 & n.2 (S.D.N.Y.1996) (citing 20 C.F.R. § 404.1567(a)).

But, when claimants also suffer from nonexertional impairments, [9] direct application of the grids to determine disability is not permitted. The Commissioner nonetheless permits administrative law judges to consult them as a "framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by ... nonexertional limitations." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(2). SSR 85–15 addresses this "framework" analysis, and directs that when evaluating nonexertional impairments, an administrative law judge should first consult the grids, along with consideration of the claimant's RFC and vocational factors, to determine the extent of impairment caused by *exertional* limitations. *See* SSR 85–15, 1985 WL 56857, at *3. The administrative judge should next determine how much that claimant's "occupational base," (the entire exertional span from sedentary work through heavy work), is *further reduced* by effects of *nonexertional* impairments. *See id.*

[9]  "Nonexertional limitations" are "limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect [ing] only your ability to meet ... demands of jobs other than ... strength demands...." *See* 20 C.F .R. §§ 404.1569a(c)(1), 416.969a(c)(1). A nonexertional limitation is an impairment-caused limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling. Environmental restrictions (*e.g.,* difficulty tolerating some physical features of certain work settings, such as dust and fumes) are also considered to be nonexertional limitations. *See* 20 C.F.R. §§ 404.1569a (c)(1) (v), 416.969a (c)(1)(v).

The net effect is that when both exertional and nonexertional impairments are present, an administrative law judge theoretically can find a claimant *disabled* when the grids direct such a finding solely on the basis of severity of exertional impairments. But, when exertional impairments alone generate a grids

finding of *not disabled,* an administrative judge then must determine (usually from other evidence) how much nonexertional impairments further diminish that claimant's occupational base. Only when a meaningful occupational base remains can an administrative judge then deny a claim using the grids as a framework. *See Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir.1996) (a claimant's work capacity is "significantly diminished" if there is an additional loss of work capacity that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity).

**\*5** ALJ Pope utilized the sequential evaluation procedure described earlier. (T. 19–28). Findings generally favorable to Hendrickson at the first four steps established a *prima facie* case of disability. At Step 5, however, ALJ Pope concluded that Hendrickson "has not been under a disability" and his claim was denied. (T. 27–28).

ALJ Pope's complete findings and conclusions appear on pages 21—27 of the administrative transcript contained in the record before the court. (Dkt. No. 9). For present purposes, however, it is necessary to identify and then amplify certain findings at sequential Steps 2, 4 and 5:

### III. The Commissioner's Decision

| | |
|---|---|
| Step 2 | Hendrickson has severe impairments consisting of depression, anxiety, and substance abuse. (T. 21–23). |
| Step 4 | (a) Hendrickson has *physical capacity* to perform a full range of work at all exertional levels; (b) his *mental capacity* for work at all levels is diminished by depression, anxiety and substance abuse; and, consequently, (c) his overall *residual functional capacity* is limited to unskilled work that does not involve working closely with others. (T. 23–26). |
| Step 5 | (a) The grids (Medical–Vocational Rule 204.00) indicate "not disabled" with reference to Hendrickson's exertional impairments (none); (b) Hendrickson's nonexertional limitations, however, erode the occupational base of unskilled work at all exertional levels by 70%; but (c) many remaining jobs exist in the national economy for individuals with Hendrickson's residual functional capacity. (T. 27). |

*A. Step 4 Residual Functional Capacity Assessment*
When making his Step 4 findings summarized above, ALJ Pope gave "great weight" to the opinions and analyses of the two state agency experts identified earlier. Dr. Barry examined Hendrickson. Dr. Kamin conducted an "extensive review of [Hendrickson's] medical records and objective tests from all the claimant's treatment providers." (T. 27). Their respective evaluations relating to concentration, persistence and pace chronicled that Hendrickson:

• has a difficult time handling stress and making appropriate decisions (T. 373, 391);

• has a "guarded" prognosis (T. 374);

• is moderately limited in ability to perform activities with a schedule, maintain regular attendance and be punctual within customary tolerances (T. 389);

• is moderately limited in ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (T. 390);

• is moderately limited in ability to respond appropriately to changes in the work setting (T. 390);

• is moderately limited in ability to work in coordination with or proximity to others without being distracted by them (T. 390); and

• is moderately limited in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (T. 390).

**\*6** Dr. Kamin also concluded from his overall review of Hendrickson's medical records that Hendrickson has mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in concentration, persistence or pace, and one or two repeated episodes of deterioration (each of extended duration). (T. 385).

In ALJ Pope's view, this information indicates that Hendrickson's capacity for work-related activity is limited to performing unskilled work and only when not required to work closely with others. ALJ Pope explained:

"[T]he residual functional capacity finding by the undersigned accommodates some difficulties in the claimant's ability to concentrate and focus and his anxiety by providing for unskilled work which does not require working closely with other people. *The unskilled work will allow for a lower level of concentration and focus, and the limited contact with others should lessen the claimant's anxiety level and accordingly reduce the risk of panic attacks."*

(T. 25) (emphasis added).

*B. Step 5 Finding Regarding Ability to Perform Alternative Work*

Hendrickson cannot perform his past relevant work under the RFC rating ascribed to him above. Consequently, the sequential analysis proceeded to Step 5 where the burden rests with the Commissioner to show that Hendrickson can still perform alternative, available work. There, ALJ Pope could not apply the grids (Medical–Vocational Guidelines) directly because Hendrickson has nonexertional impairments. Consequently, ALJ Pope properly elicited extrinsic evidence from an impartial vocational expert, Edward Pagella, CRC, LCPC ("VE Pagella"). (T. 58–64, 101).

As is customary in these type proceedings, VE Pagella provided expert opinions in response to hypothetical questions. (T. 58–64). ALJ Pope asked VE Pagella to assume that a person of Hendrickson's age, education and experience has limitations requiring that he engage only in unskilled work that does not require working closely

with others. (T. 59–60). Based on those assumptions, VE Pagella opined that such a person's occupational base will be reduced by 70%. (T. 60–61). VE Pagella also opined that thousands of jobs in the light and sedentary categories exist in the remaining 30% of the occupational base. *Id.* He identified several representative occupations within this remaining occupational base. *Id.*

In sum, VE Pagella provided testimony concerning (a) extent of erosion of Hendrickson's occupational base caused by limitations posed in the hypothetical question posed and (b) availability of a meaningful remaining occupational base for a person with such limitations. Given this evidence, ALJ Pope concluded that Hendrickson is not disabled because there are jobs that he can perform despite his limitations. (T. 27).

### IV. Alleged Errors

Hendrickson claims that ALJ Pope committed multiple errors in his application of sequential Steps 4 and 5. Specifically, Hendrickson contends:

**\*7** • The ALJ failed to develop the record by failing to obtain opinions from Plaintiff's treating physicians.

• The ALJ failed to obtain opinions from Plaintiff's social workers, nurse, and counselors.

• The ALJ's residual functional capacity finding is not supported by substantial evidence and is the product of legal error.

• The ALJ failed to apply appropriate legal standards in assessing Plaintiff's credibility.

• The ALJ's Step 5 determination is unsupported by substantial evidence and is the product of legal error.

(Dkt. No. 12, pp. 1, 8–24).

In response, the Commissioner maintains that ALJ Pope properly evaluated his RFC assessment with substantial evidence at Step 4, sufficiently developed the record of Hendrickson's impairments, and correctly found that Hendrickson could perform other work existing in significant numbers in the national economy at Step 5. (Dkt. No. 14, pp. 15–25).

### V. Judicial Review

The court's limited role is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.,* 562 F.3d 503, 507 (2d Cir.2009), *cert. denied,* —— U.S. ——, 130 S.Ct. 1503 (2010); *Berry,* 675 F.2d at 467; *see also* 42 U.S.C. § 405(g). When proper principles of law were applied, and when the Commissioner's decision is supported by substantial evidence,[10] the Commissioner's findings are conclusive and must be affirmed. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *see also* 42 U.S.C. § 405(g); *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004).

[10]   "Substantial evidence" is a term of art. It means less than a "preponderance" (usual standard in civil cases), but "more than a mere scintilla," or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir.2009); *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004). Stated another way, to be "substantial," evidence need only be "enough to justify, if the trial were submitted to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *National Labor Relations Bd. v. Columbian Enameling & Stamping Co.,* 306 U.S. 262, 299–300 (1939), *cited in* Harvey L. McCormick, Social Security Claims and Procedures § 672 (4th ed.1991).

### VI. Discussion and Analysis

Hendrickson's proffered errors regarding inadequate development of the record and a flawed credibility determination need not be addressed on their merits because a necessary and proper disposition reveals itself by focusing initially on points arguing that (a) correct principles of law were not applied to the Step 4 RFC finding and (b) substantial evidence does not support the Step 5 finding that Hendrickson can still perform alternative, available work. These two points, while analytically distinct, are closely entwined.

*A. Failure to Apply Correct Principles of Law at Step 4*

A legally-correct RFC determination must account for all of a claimant's limitations imposed by both severe and non-severe impairments. *See* discussion in Section II.*B*.2, *supra*. ALJ Pope, giving great weight to the state agency experts' findings and opinions, found Hendrickson's capacity to perform a full range of work at all exertional levels to be limited only to the extent that such work must be (a) unskilled and (b) not involve working closely with others. (T. 23, 26). This RFC assessment clearly accounts for the state agency experts' determinations that Hendrickson has moderate limitations in working in coordination with or proximity to others, and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. (T. 25–26). It does not, however, reckon the remaining limitations found by Dr. Barry and Dr. Kamin unless those limitations are subsumed in a generic, catch-all limitation for "unskilled work."

**\*8** ALJ Pope's written decision is thoughtful, considerate and generally meticulous.[11] Hendrickson undisputably has long-standing and severe mental limitations,[12] and ALJ Pope obviously intended to factor them into his residual functional capacity analysis. His unskilled-work limitation is problematic, however, if he intended it to account for all of Hendrickson's other mental impairments.

[11]   ALJ Pope acknowledged that SSR 96–8p requires that the mental residual functional capacity assessment used at steps 4 and 5 requires a more detailed assessment by itemizing the various functions contained in the broad categories found in paragraph B and paragraph C of the adult mental disorders listing in 12.00 of the Listing impairments. (T. 22–23).

[12]   Treatment notes and a multitude of Global Assessment of Functioning ("GAF") scores document Hendrickson's serious mental limitations. "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.' " *Kohler,* 546 F.3d at 262 n.1 (citing *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.2000)). GAF "ranks psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *Pollard v. Halter,* 377 F.3d 183, 186 (2d Cir.2004).

Hendrickson has been diagnosed with several GAF ratings, ranging in June 2007 from 20 (GAF score 11–20 indicates an individual is in "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygeine ... or gross impairment in communication") (T. 251–52) to a GAF of 35 (GAF score 31–40 indicates an individual has "[s]ome impairment in reality testing or communication ... or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood") (T. 233). *See Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV–TR"* ) 34 (4th ed.2000). In July 2007, he was diagnosed with a GAF of 30 (T. 278, 299, 300). *See id.* In January 2008, his GAF was rated at 37 (T. 397) and, later, at 42 (GAF score 41–50 indicates an individual has "[s]erious symptoms ... or any serious impairment in social, occupational, or school functioning") (T. 402). *See id.* In August 2009, Hendrickson's GAF was scored at 50. *See id.* Treatment notes also reflect that Hendrickson's episodes are triggered by major stresses. (T. 427).

First, it is not *self-evident* that a person with limited ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances will function more acceptably when assigned only unskilled tasks. Second, the Commissioner's *official definition* of unskilled work does not support such premise, nor does it indicate that unskilled work ameliorates stress, or better enables a worker to complete a normal workday and workweek without interruptions from psychologically-based symptoms, or to work at a consistent pace, or to respond appropriately to changes in the work setting. [13] Third, no *extrinsic evidence* presented to ALJ Pope shows that unskilled work appropriately addresses these additional limitations, and, finally, the Commissioner's brief cites no *other authoritative sources* supporting that supposition.

[13]    The basic demands of unskilled work include abilities (on a sustained basis) to understand, carry out and remember simple instructions; make simple work-related decisions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting. SSR 96–9, POLICY INTERPRETATION RULING TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK–IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, 1996 WL 374185, at *9 (SSA July 2, 1996).

Intuitively, one might suppose that unskilled work probably involves less stress. In an interpretive Ruling, however, the Commissioner cautions against making such broad assumptions. In SSR 85–15, the Commissioner states unequivocally that "*[a] claimant's condition [due to stress and mental illness] may make performance of an unskilled job as difficult as an objectively more demanding job.*" The Ruling elucidates that mentally impaired individuals' reactions to demands of work stress are highly individualized, and that in some cases, they have difficulty meeting requirements of even low stress jobs. And, of special relevance here, the Ruling emphasizes that "*the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job." Id.* Accordingly the Ruling directs that (a) ALJs make particularized findings about the nature of a claimant's stress, the circumstances that trigger it, and how those factors affect his ability to work, and (b) every impairment-related limitation created by an individual's response to demands of work be reflected in the RFC assessment. *Id.*

Finally, interpretive jurisprudence generally rejects the idea that a broad limitation of "unskilled work" suffices as a detailed assessment of the type required by SSR 96–8p, 1996 WL 374184, at *4. Thus, an administrative judge may not avoid conducting such a detailed assessment by merely indicating that the claimant can perform simple, unskilled work. *See, e.g., Thompson v. Astrue,* No. 10–CV–6576 CJS, 2012 WL 2175781, at *13 (W.D.N.Y. May 30, 2012) (when making findings about a claimant's RFC, an ALJ may not avoid conducting such a detailed assessment by merely indicating that the claimant can perform simple, unskilled work); *Sweat v. Astrue,* No. 08–CV–1108 (FJS/ VEB), 2011 WL 2532932, at *6 (N.D.N.Y. May 23, 2011) (on remand ALJ admonished to address the consultative examiners' findings that claimant had difficulty dealing with stress during the relevant time period, as ALJ did not explain how he reconciled those findings with his RFC assessment).

**\*9** For all these reasons, a conclusion that ALJ Pope did not apply correct principles of law when making his RFC determination is warranted. He did not make particularized findings about the nature of Hendrickson's stress, the circumstances that trigger it, and how those factors affect his ability to work. He did not—possibly

could not under evidence before him—sufficiently connect the dots between all of Hendrickson's impairments and his RFC finding.

## B. Substantial Evidence Error at Step Five

Given a legally-flawed RFC finding, a Step 5 error was sure to follow. ALJ Pope used his RFC as the basis for his hypothetical question to the vocational expert. Thus, his hypothetical question failed to include all of Hendrickson's nonexertional limitations. (T. 58–64). Specifically, ALJ Pope's hypothetical question to the vocational expert did not include limitations related to Hendrickson's stress or three of the five other moderate impairments listed earlier. (T. 58–64, 373, 389–91).

For expert vocational opinion to constitute substantial evidence, the hypothetical question posed to the vocational expert must include all limitations supported by medical evidence in the record. *See Dumas v. Schweiker, 712 F.2d 1545, 1553–54 (2d Cir.1983)* (The Commissioner may rely on a vocational expert's testimony concerning the availability of jobs suited to a hypothetical person's capabilities so long as the hypothetical is based on substantial evidence.); *see also Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir.2002)* ("A hypothetical question posed to a vocational expert must reflect all of a claimant's impairments.... Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question ..., the expert's response is not considered substantial evidence." (internal citations and quotation marks omitted)). The reason for this requirement is that it is important for the vocational expert to understand the full extent of the applicant's disability so that the expert does not declare an applicant capable of undertaking work in the national or local economy that the applicant cannot truly perform.

VE Pagella expressed opinions concerning the extent to which Hendrickson's job base is eroded by nonexertional limitations and also the existence and extent of jobs within the remaining occupational basis that Hendrickson can perform. Because the hypothetical question on which VE Pagella based these opinions failed to account for additional specific impairments that are medically undisputed, his testimony does not constitute substantial evidence. [14] ALJ Pope adduced no other evidence that Hendrickson is capable of performing jobs existing in significant numbers in the national economy. Thus,

his conclusion that Hendrickson is not disabled lacks substantial evidentiary support. In this circumstance, reversal and remand are warranted.

[14]  The Second Circuit has nor directly addressed the question of whether an ALJ's hypothetical question to a VE must specifically account for limitations in concentration, persistence, and pace. Other circuits, however, have addressed the issue and answer in the affirmative. *See, e.g., Winschel v. Commissioner of Soc. Sec., 631 F.3d 1176, 1180–81 (11th Cir.2011)* (ALJ erred by failing to either "explicitly include[ ]" or "implicitly account for" moderate limitations in maintaining concentration, persistence, and pace in a hypothetical); *Stewart v. Astrue, 561 F.3d 679, 685 (7th Cir.2009)* (restricting hypothetical to ability to do "simple, routine tasks that do not require constant interactions with coworkers or the general public" does not accurately describe documented limitations in concentration, persistence, or pace); *Bowers v. Astrue, 271 Fed. App'x 731, 733 (10th Cir.2008)* (hypothetical including limitations for simple, repetitive, and routine work with a low stress level and only brief contact with the public did not account for impairment in concentration and attention); *Ramirez v. Barnhart, 372 F.3d 546, 554 (3d Cir.2004)* (hypothetical restriction to simple one or two-step tasks did not account for limitations in concentration); *Kasarsky v. Barnhart, 335 F.3d 539, 544 (7th Cir.2003)* (hypothetical about a person with borderline intelligence did not account for deficiencies in concentration); *Newton v. Chater, 92 F.3d 688, 695 (8th Cir.1996)* (hypothetical limiting claimant to performing only simple tasks did not account for deficiencies in concentration, persistence, or pace).

## VII. Recommendation

1. The Commissioner's decision should be **REVERSED** and the case **REMANDED** pursuant to 42 U.S.C. § 405(g), sentence four, for further proceedings including reexamination of: (a) Hendrickson's difficulties in handling stress, including but not limited to his moderate limitations in the areas of ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and ability to respond appropriately to changes in the work setting; and (b) the extent to

which Hendrickson's occupational base is eroded by his difficulties handling stress and the moderate limitations listed above.

**\*10**  2. To guard against necessity for further actions seeking judicial review, the court also should request that, on remand, the Commissioner also reflect on *all* errors asserted in this action as set forth herein at Section IV.

### VIII. Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn,* 474 U.S. 140, 155 (1985); *Graham v. City of New York,* 443 Fed. App'x 657, 658 (2d Cir.2011); *FDIC v. Hillcrest Assocs.,* 66 F.3d 566, 569 (2d Cir.1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the *10* day of *December* 2012.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 7784156

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

SSR 85-15 (S.S.A.), 1983-1991 Soc.Sec.Rep.Serv. 343, 1985 WL 56857

Program Policy Statement

TITLES II AND XVI: CAPABILITY TO DO OTHER WORK--THE MEDICAL-VOCATIONAL
RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS

**SSR 85-15**
**(PPS-119)**
1985

**\*1  This supersedes Program Policy Statement No. 116 (SSR 85-7) with the same title (which superseded Program Policy Statement No. 104 (SSR 83-13) and is in accord with an order of the U.S. District Court for the District of Minnesota.**

**PURPOSE**: The original purpose of SSR 83-13 was to clarify how the regulations and the exertionally based numbered decisional rules in Appendix 2, Subpart P, Regulations No. 4, provide a framework for decisions concerning persons who have only a nonexertional limitation(s) of function or an environmental restriction(s). The purpose of this revision to SSR 83-13 and SSR 85-7 is to emphasize, in the sections relating to mental impairments: (1) that the potential job base for mentally ill claimants without adverse vocational factors is not necessarily large even for individuals who have no other impairments, unless their remaining mental capacities are sufficient to meet the intellectual and emotional demands of at least unskilled, competitive, remunerative work on a sustained basis; and (2) that a finding of disability can be appropriate for an individual who has a severe mental impairment which does not meet or equal the Listing of Impairments, even where he or she does not have adversities in age, education, or work experience.

**CITATIONS (AUTHORITY)**: Sections 223(d)(2)(A) and 1614(a)(3)(E) of the Social Security Act; Regulations No. 4, Subpart P, sections 404.1505(a), 404.1520(f)(1), 404.1521(b), 404.1545, and 404.1560 through 404.1569; Appendix 2 of Subpart P, sections 200.00(c), 200.00(e)(1), and 204.00; and Regulations No. 16, Subpart 1, sections 416.905(a), 416.920(f)(1), 416.921(b), 416.945, and 416.960 through 416.969.

**PERTINENT HISTORY**: If a person has a severe medically determinable impairment which, though not meeting or equaling the criteria in the Listing of Impairments, prevents the person from doing past relevant work, it must be determined whether the person can do other work. This involves consideration of the person's RFC and the vocational factors of age, education, and work experience.

The Medical-Vocational Guidelines (Regulations No. 4, Subpart P, Appendix 2) discuss the relative adjudicative weights which are assigned to a person's age, education, and work experience. Three tables in Appendix 2 illustrate the interaction of these vocational factors with his or her RFC. RFC is expressed in terms of sedentary, light, and medium work exertion. The table rules reflect the potential occupational base of unskilled jobs for individuals who have severe impairments which limit their exertional capacities: approximately 2,500 medium, light, and sedentary occupations; 1,600 light and sedentary occupations; and 200 sedentary occupations--each occupation representing numerous jobs in the national economy. (See the text and glossary in SSR 83-10, PPS-101, Determining Capability to Do Other Work--the Medical-Vocational Rules of Appendix 2.) Where individuals also have nonexertional limitations of function or environmental restrictions, the table rules provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs within these exertional ranges that would be contraindicated by the additional limitations or restrictions. However, where a person has solely a nonexertional impairment(s), the table rules do not direct conclusions of disabled or not disabled. Conclusions must, instead, be based on the principles in the appropriate sections of the regulations, giving consideration to the rules for specific case situations in Appendix 2.

**\*2**  This PPS clarifies policies applicable in cases involving the evaluation of solely nonexertional impairments.

**POLICY STATEMENT**: Given that no medically determinable impairment limits exertion, the RFC reflecting the severity of the particular nonexertional impairment(s) with its limiting effects on the broad world of work is the first issue. The individual's relative advantages or adversities in terms of age, education, and work experience is the second. Section 204.00 of Appendix 2 provides an example of one type of nonexertional impairment-environmental restrictions-- and states that environmental restrictions ordinarily would not significantly affect the range of work existing in the national economy for individuals with the physical capability for heavy work (or very heavy work); i.e., with no medically determinable impairment which limits exertion. However, numerous environmental restrictions might lead to a different conclusion, as might one or more severe losses of nonexertional functional capacities. The medical and vocational factors of the individual case determine whether exclusion of particular occupations or kinds of work so reduces the person's vocational opportunity that a work adjustment could not be made.

Nonexertional Impairments Contrasted With Exertional Impairments

The term "exertional" has the same meaning in the regulations as it has in the U.S. Department of Labor's classifications of occupations by strength levels. (See SSR 83-10, PPS-101, Determining Capability to Do Other Work--The Medical-Vocational Rules of Appendix 2.) Any job requirement which is not exertional is considered to be nonexertional. A nonexertional impairment is one which is medically determinable and causes a nonexertional limitation of function or an environmental restriction. Nonexertional impairments may or may not affect a person's capacity to carry out the primary strength requirements of jobs, and they may or may not significantly narrow the range of work a person can do.

Nonexertional limitations can affect the abilities to reach; to seize, hold, grasp, or turn an object (handle); to bend the legs alone (kneel); to bend the spine alone (stoop) or bend both the spine and legs (crouch). Fine movements of small objects, such as done in much sedentary work and in certain types of more demanding work (e.g., surgery), require use of the fingers to pick, pinch, etc. Impairments of vision, speech, and hearing are nonexertional. Mental impairments are generally considered to be nonexertional, but depressions and conversion disorders may limit exertion. Although some impairments may cause both exertional limitations and environmental restrictions (e.g., a respiratory impairment may limit a person to light work exertion as well as contraindicate exposure to excessive dust or fumes), other impairments may result in only environmental restrictions (e.g., skin allergies may only contraindicate contact with certain liquids). What is a nonexertional and extremely rare factor in one range of work (e.g., crawling in sedentary work) may become an important element in arduous work like coal mining.

**\*3**  Where a person's exertional capacity is compromised by a nonexertional impairment(s), see SSR 83-14, PPS-105, Capability to Do Other Work--The Medical-Vocational Rules as a Framework for Evaluating a Combination of Exertional and Nonexertional Impairments.

Jobs which can possibly be performed by persons with solely nonexertional impairments are not limited to the approximately 2,500 unskilled sedentary, light and medium occupations which pertain to the table rules in Appendix 2. The occupational base cuts across exertional categories through heavy (and very heavy) work and will include occupations above the unskilled level if a person has skills transferable to skilled or semiskilled occupations within his or her RFC. (Note the examples in item 4.b of SSR 82-41, PPS-67, Work Skills and Their Transferability as Intended by the Expanded Vocational Factors Regulations effective February 26, 1979, where medical factors prevent not only the performance of past work but also the transferability of skills.)

Given no medically determinable impairment which limits exertion, the first issue is how much the person's occupational base--the entire exertional span from sedentary work through heavy (or very heavy) work--is reduced by the effects of

the nonexertional impairment(s). This may range from very little to very much, depending on the nature and extent of the impairment(s). In many cases, a decisionmaker will need to consult a vocational resource.

The publications listed in sections 404.1566 and 416.966 of the regulations will be sufficient vocational resources for relatively simple issues. In more complex cases, a person or persons with specialized knowledge would be helpful. State agencies may use personnel termed vocational consultants or specialists, or they may purchase the services of vocational evaluation workshops. Vocational experts may testify for this purpose at the hearing and appeals levels. In this PPS, the term vocational specialist (VS) describes all vocational resource personnel.

The second issue is whether the person can be expected to make a vocational adjustment considering the interaction of his or her remaining occupational base with his or her age, education, and work experience. A decisionmaker must consider sections 404.1562-404.1568 and 416.962-416.968 of the regulations, section 204.00 of Appendix 2, and the table rules for specific case situations in Appendix 2. If, despite the nonexertional impairment(s), an individual has a large potential occupational base, he or she would ordinarily not be found disabled in the absence of extreme adversities in age, education, and work experience. (This principle is illustrated in rules 203.01, 203.02, and 203.10 and is set out in SSR 82-63, PPS-79, Medical- Vocational Profiles Showing an Inability to Make an Adjustment to Other Work.) The assistance of a vocational resource may be helpful. Whenever vocational resources are used and the decision is adverse to the claimant, the determination or decision will include: (1) citations of examples of occupations/jobs the person can do functionally and vocationally, and (2) a statement of the incidence of such work in the region in which the individual resides or in several regions of the country.

Examples of Nonexertional Impairments and Their Effects on the Occupational Base

**\*4** 1. Mental Impairments

There has been some misunderstanding in the evaluation of mental impairments. Unless the claimant or beneficiary is a widow, widower, surviving divorced spouse or a disabled child under the Supplemental Security Income program, the sequential evaluation process mandated by the regulations does not end with the finding that the impairment, though severe, does not meet or equal an impairment listed in Appendix 1 of the regulations. The process must go on to consider whether the individual can meet the mental demands of past relevant work in spite of the limiting effects of his or her impairment and, if not, whether the person can do other work, considering his or her remaining mental capacities reflected in terms of the occupational base, age, education, and work experience. The decisionmaker must not assume that failure to meet or equal a listed mental impairment equates with capacity to do at least unskilled work. This decision requires careful consideration of the assessment of RFC.

In the world of work, losses of intellectual and emotional capacities are generally more serious when the job is complex. Mental impairments may or may not prevent the performance of a person's past jobs. They may or may not prevent an individual from transferring work skills. (See SSR 82-41, PPS-67, Work Skills and Their Transferability as Intended by the Expanded Vocational Factors Regulations effective February 26, 1979.)

Where a person's only impairment is mental, is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work and prevents the transferability of acquired work skills, the final consideration is whether the person can be expected to perform unskilled work. The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

Example 1: A person whose vocational factors of age, education, and work experience would ordinarily be considered favorable (i.e., very young age, university education, and highly skilled work experience) would have a severely limited occupational base if he or she has a mental impairment which causes a substantial loss of ability to respond appropriately to supervision, coworkers, and usual work situations. A finding of disability would be appropriate.

Where there is no exertional impairment, unskilled jobs at all levels of exertion constitute the potential occupational base for persons who can meet the mental demands of unskilled work. These jobs ordinarily involve dealing primarily with objects, rather than with data or people, and they generally provide substantial vocational opportunity for persons with solely mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis. However, persons with this large job base may be found disabled because of adversities in age, education, and work experience. (This is illustrated in examples 2 and 3 immediately following.)

 *5  Example 2: Someone who is of advanced age, has a limited education, has no relevant work experience, and has more than a nonsevere mental impairment will generally be found disabled. (See SSR 82-63, PPS-79, Medical-Vocational Profiles Showing an Inability to Make an Adjustment to Other Work.)

Example 3: Someone who is closely approaching retirement age, has a limited education or less, worked for 30 years in a cafeteria doing an unskilled job as a "server," almost constantly dealing with the public, and now cannot, because of a severe mental impairment, frequently deal with the public. In light of the narrowed vocational opportunity in conjunction with the person's age, education, lack of skills, and long commitment to the particular type of work, a finding of disabled would be appropriate; but the decision would not necessarily be the same for a younger, better-educated, or skilled person. (Compare sections 404.1562 and 416.962 of the regulations and rule 203.01 of Appendix 2.)

Where a person has only a mental impairment but does not have extreme adversities in age, education, and work experience, and does not lack the capacity to do basic work-related activities, the potential occupational base would be reduced by his or her inability to perform certain complexities or particular kinds of work. These limitations would affect the occupational base in various ways.

Example 4: Someone who is of advanced age, has a high school education, and did skilled work as manager of a housing project can no longer, because of a severe mental impairment, develop and implement plans and procedures, prepare budget requests, schedule repairs or otherwise deal with complexities of this level and nature. Assuming that, in this case, all types of related skilled jobs are precluded but the individual can do work which is not detailed and does not require lengthy planning, the remaining related semiskilled jobs to which skills can be transferred and varied unskilled jobs, at all levels of exertion, constitute a significant vocational opportunity. A conclusion of "not disabled" would be appropriate. (Compare rules 201.07, 202.07, and 203.13 of Appendix 2.)

Example 5: Someone who is of advanced age, has a limited education, and did semiskilled work as a first-aid attendant no longer has the mental capacity to work with people who are in emergency situations and require immediate attention to cuts, burns, suffocation, etc. Although there may be very few related semiskilled occupations to which this person could transfer work skills, the large occupational base of unskilled work at all levels of exertion generally would justify a finding of not under a disability. (This is consistent with rules 203.11-203.17 of Appendix 2.)

Stress and Mental Illness--Since mental illness is defined and characterized by maladaptive behavior, it is not unusual that the mentally impaired have difficulty accommodating to the demands of work and work-like settings. Determining whether these individuals will be able to adapt to the demands or "stress" of the workplace is often extremely difficult. This section is not intended to set out any presumptive limitations for disorders, but to emphasize the importance of thoroughness in evaluation on an individualized basis.

**\*6**  Individuals with mental disorders often adopt a highly restricted and/or inflexible lifestyle within which they appear to function well. Good mental health services and care may enable chronic patients to function adequately in the community by lowering psychological pressures, by medication, and by support from services such as outpatient facilities, day-care programs, social work programs and similar assistance.

The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day. A person may become panicked and develop palpitations, shortness of breath, or feel faint while riding in an elevator; another may experience terror and begin to hallucinate when approached by a stranger asking a question. Thus, the mentally impaired may have difficulty meeting the requirements of even so-called "low-stress" jobs.

Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job. for example, a busboy need only clear dishes from tables. But an individual with a severe mental disorder may find unmanageable the demands of making sure that he removes all the dishes, does not drop them, and gets the table cleared promptly for the waiter or waitress. Similarly, an individual who cannot tolerate being supervised may not be able to work even in the absence of close supervision; the *knowledge* that one's work is being judged and evaluated, even when the supervision is remote or indirect, can be intolerable for some mentally impaired persons. Any impairment-related limitations created by an individual's response to demands of work, however, must be reflected in the RFC assessment.

2.Postural-Manipulative Impairments

a. Limitations in *climbing and balancing* can have varying effects on the occupational base, depending on the degree of limitation and the type of job. Usual everyday activities, both at home and at work, include ascending or descending ramps or a few stairs and maintaining body equilibrium while doing so. These activities are required more in some jobs than in others, and they may be critical in some occupations. Where a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work. Certain occupations, however, may be ruled out; e.g., the light occupation of construction painter, which requires climbing ladders and scaffolding, and the very heavy occupation of fire-fighter, which sometimes requires the individual to climb poles and ropes. Where the effects of a person's actual limitations of climbing and balancing on the occupational base are difficult to determine, the services of a VS may be necessary.

**\*7**  b. *Stooping, kneeling, crouching, and crawling* are progressively more strenuous forms of bending parts of the body, with crawling as a form of locomotion involving bending. Some stooping (bending the body downward and forward by bending the spine at the waist) is required to do almost any kind of work, particularly when objects below the waist are involved. If a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact. However, because of the lifting required for most medium, heavy, and very heavy jobs, a person must be able to stoop frequently (from one-third to two-thirds of the time); inability to do so would substantially affect the more strenuous portion of the occupational base. This is also true for crouching (bending the body downward and forward by bending both the legs and spine). However, crawling on hands and knees and feet is a relatively rare activity even in arduous work, and limitations on the ability to crawl would be of little significance in the broad world of work. This is also true of kneeling (bending the legs at the knees to come to rest on one or both knees).

c. *Reaching, handling, fingering, and feeling* require progressively finer usage of the upper extremities to perform work-related activities. Reaching (extending the hands and arms in any direction) and handling (seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands) are activities required in almost all jobs. Significant limitations of reaching or handling, therefore, may eliminate a large number of occupations a person could otherwise

do. Varying degrees of limitations would have different effects, and the assistance of a VS may be needed to determine the effects of the limitations. "Fingering" involves picking, pinching, or otherwise working primarily with the fingers. It is needed to perform most unskilled sedentary jobs and to perform certain skilled and semiskilled jobs at all levels of exertion. As a general rule, limitations of fine manual dexterity have greater adjudicative significance--in terms of relative numbers of jobs in which the function is required--as the person's exertional RFC decreases. Thus, loss of fine manual dexterity narrows the sedentary and light ranges of work much more than it does the medium, heavy, and very heavy ranges of work. The varying degrees of loss which can occur may require a decision-maker to have the assistance of a VS. However, a VS would not ordinarily be required where a person has a loss of ability to feel the size, shape, temperature, or texture of an object by the finger-tips, since this is a function required in very few jobs.

3. Hearing Impairments

Communication is an important factor in work. The inability to hear, because it vitally affects communication, is thus of great importance. However, hearing impairments do not necessarily prevent communication, and differences in types of work may be compatible with various degrees of hearing loss. Occupations involving loud noise, such as in printing, have traditionally attracted persons with hearing impairments, whereas individuals with normal hearing have to wear ear protectors to be able to tolerate the working conditions. On the other hand, occupations such as bus driver require good hearing. There are so many possible medical variables of hearing loss that consultation of vocational reference materials or the assistance of a VS is often necessary to decide the effect on the broad world of work.

 **8** 4. Visual Impairments

As a general rule, even if a person's visual impairment(s) were to eliminate all jobs that involve very good vision (such as working with small objects or reading small print), as long as he or she retains sufficient visual acuity to be able to handle and work with rather large objects (and has the visual fields to avoid ordinary hazards in a workplace), there would be a substantial number of jobs remaining across all exertional levels. However, a finding of disability could be appropriate in the relatively few instances in which the claimant's vocational profile is extremely adverse, e.g., closely approaching retirement age, limited education or less, unskilled or no transferable skills, and essentially a lifetime commitment to a field of work in which good vision is essential.

5. Environmental Restrictions

A person may have the physical and mental capacity to perform certain functions in certain places, but to do so may aggravate his or her impairment(s) or subject the individual or others to the risk of bodily injury. Surroundings which an individual may need to avoid because of impairment include those involving extremes of temperature, noise, and vibration; recognized hazards such as unprotected elevations and dangerous moving machinery; and fumes, dust, and poor ventilation. A person with a seizure disorder who is restricted only from being on unprotected elevations and near dangerous moving machinery is an example of someone whose environmental restriction does not have a significant effect on work that exists at all exertional levels.

Where a person has a medical restriction to avoid excessive amounts of noise, dust, etc., the impact on the broad world of work would be minimal because most job environments do not involve great noise, amounts of dust, etc.

Where an individual can tolerate very little noise, dust, etc., the impact on the ability to work would be considerable because very few job environments are entirely free of irritants, pollutants, and other potentially damaging conditions.

Where the environmental restriction falls between very little and excessive, resolution of the issue will generally require consultation of occupational reference materials or the services of a VS.

**EFFECTIVE DATE**: Final regulations providing theMedical-Vocational Guidelines were published in the *Federal Register* on November 28, 1978, at FR 55349, effective February 26, 1979. They were rewritten to make them easier to understand and were published on August 20, 1980, at 45 FR 55566. The policies in this PPS also became effective as of February 26, 1979.

**CROSS-REFERENCES: Program Operations Manual System, Part 4 (Disability Insurance State Manual Procedures) sections DI 00401.691 and 00401.694; SSR 83-10, PPS-101, Determining Capability to Do Other Work--The Medical-Vocational Rules of Appendix 2 (with a glossary); SSR 83-11, PPS-102, Capability to Do Other Work--The Exertionally Based Medical-Vocational Rules Met; SSR 83-12, PPS-103, Capability to Do Other Work--The Medical-Vocational Rules as a Framework for Evaluating Exertional Limitations Within a Range of Work or Between Ranges of Work; and SSR 83-14, PPS-105, Capability to Do Other Work-- The Medical-Vocational Rules as a Framework for Evaluating a Combination of Exertional and Nonexertional Impairments.**

Social Security Administration

Department of Health and Human Services

SSR 85-15 (S.S.A.), 1983-1991 Soc.Sec.Rep.Serv. 343, 1985 WL 56857

---

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW** © 2018 Thomson Reuters. No claim to original U.S. Government Works. 7

2015 WL 457643
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Richard Allen BLISS, Plaintiff,

v.

Carolyn W. COLVIN, Commissioner,
Social Security Administration, Defendant.

No. 3:13–cv–1086 (GLS/CFH).
|
Signed Feb. 3, 2015.

**Attorneys and Law Firms**

Legal Services of Central New York, Christopher Cadin, Esq., of Counsel, Syracuse, NY, for the Plaintiff.

Hon. Richard S. Hartunian, United States Attorney, Jason P. Peck, Special Assistant U.S. Attorney, of Counsel, Syracuse, NY, Steven P. Conte, Regional Chief Counsel, Social Security Administration, Office of General Counsel, Region II, New York, NY, for the Defendant.

*MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff Richard Allen Bliss challenges defendant Commissioner of Social Security's denial of social security disability insurance benefits (DIB) and supplemental security income (SSI), seeking review under 42 U.S.C. § 405(g).[1] (Compl., Dkt. No. 1.) In a Report–Recommendation and Order (R & R) filed August 8, 2014, Magistrate Judge Christian F. Hummel recommended that the Commissioner's decision be affirmed and Bliss' complaint be dismissed. (Dkt. No. 19.) Pending are Bliss' objections to the R & R. (Dkt. No. 20.) For the reasons that follow, the court adopts the R & R in its entirety.

[1]     42 U.S.C. § 1383(c)(3) renders section 405(g) applicable to judicial review of SSI claims.

### II. *Background*[2]

[2]     The court incorporates the factual recitations of the parties and Judge Hummel. (Dkt. No. 17 at 1–6; Dkt. No. 18 at 2; Dkt. No. 19 at 2.)

On September 13, 2010, Bliss filed an application for DIB and SSI under the Social Security Act. (Tr.[3] at 93–99, 100, 188–94, 195–200.) After his application was denied, (id. at 27, 101–06), Bliss requested a hearing before an Administrative Law Judge (ALJ), which was held on April 12, 2012, (id. at 21–23, 43–92). On May 10, 2012, the ALJ issued a decision denying the requested relief, (id. at 24–42), which became the Commissioner's final determination upon the Social Security Administration Appeals Council's denial of review, (id. at 1–5).

[3]     Page references preceded by "Tr." are to the Administrative Transcript. (Dkt. No. 13.)

Bliss commenced the present action by filing a complaint on September 4, 2013, seeking judicial review of the Commissioner's determination. (*See generally* Compl.) After receiving the parties' briefs, Judge Hummel issued an R & R recommending dismissal of Bliss' complaint. (Dkt. No. 19.)

### III. *Standard of Review*

By statute and rule, district courts are authorized to refer social security appeals to magistrate judges for proposed findings and recommendations as to disposition. *See* 28 U.S.C. § 636(b) (1)(A), (B); N.D.N.Y. L.R. 40.1, 72.3(d); General Order No. 18. Before entering final judgment, this court reviews report and recommendation orders in cases it has referred to a magistrate judge. If a party properly objects to a specific element of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo*. *See Almonte v. N.Y. State Div. of Parole,* No. Civ. 904CV484GLS, 2006 WL 149049, at *3, *5 (N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, only vague or general objections are made, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and recommendations of the magistrate judge for clear error. *See id.* at *4–5.

### IV. *Discussion*

Bliss purports to object to the R & R on several grounds. (Dkt. No. 20 at 5–24.) First, he asserts that the ALJ erred in determining the severity of his impairments. (*Id.* at 5–8.) Second, Bliss contends that the ALJ improperly failed to develop the record by not re-contacting one of Bliss' treating physicians. (*Id.* at 8–10.) Third, Bliss argues that the ALJ should have given controlling weight to the opinion of one of his treating physicians, and that the ALJ's credibility determination with respect to Bliss' own statements regarding his symptoms was flawed. (*Id.* at 11–13, 20–22.) Next, Bliss asserts that the ALJ's residual functional capacity determination "is inaccurate, incomplete, and not supported by substantial evidence." (*Id.* at 13–20.) Lastly, Bliss contends that the other alleged errors in the ALJ's analysis tainted the step five determination that there were a significant number of jobs in the national economy that Bliss could perform. (*Id.* at 22–24.)

**\*2** The substance of these arguments, however, was previously raised in Bliss' initial memorandum of law and considered and rejected by Judge Hummel. (*Compare id.* at 5–24, *with* Dkt. No. 17 at 10–25.) Bliss' objections are, in fact, nearly identical to, and appear to be, for the most part, copied directly from, the arguments raised in his original brief. He makes only passing references to the R & R, and has not identified any specific errors made by the magistrate judge. Instead, he reiterates his assertions that the ALJ erred in his analysis. Bliss' "objections," therefore, are general and do not warrant *de novo* review. *See Gusky v. Astrue,* 954 F.Supp.2d 180, 184 (W.D.N.Y.2013) ( "[W]hen the objections simply reiterate previous arguments ... the Court should review the report for clear error."); *Almonte,* 2006 WL 149049, at \*4. The court, having carefully reviewed the record, finds no clear error in the R & R and accepts and adopts it in its entirety.

### V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Christian F. Hummel's August 8, 2014 Report–Recommendation and Order (Dkt. No. 19) is **ADOPTED** in its entirety; and it is further

**ORDERED** that the decision of the Commissioner is **AFFIRMED** and Bliss' complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION AND ORDER [1]

[1]  This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff Richard Allen Bliss ("Bliss") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for benefits under the Social Security Act. Compl. (Dkt. No. 1). Bliss moves for a finding of disability and seeks to have the decision vacated and reversed, or alternatively, remanded to the Commissioner for further proceedings. Pl.'s Mem. (Dkt. No. 17) at 6. The Commissioner cross-moves for a judgment on the pleadings. Def.'s Mem. (Dkt. No. 18) at 3. For the following reasons, it is recommended that the Commissioner's decision be affirmed.

### I. Background

### A. Facts

Born on May 6, 1967, Bliss was forty-three years old when he applied for disability benefits. Tr. at 95, 188. [2] Bliss did not complete high school, finishing only the eleventh grade in special education. Tr. at 49. While in high school, Bliss attempted, but did not complete, a vocational food service training program. Tr. at 53. Bliss has attempted his GED three times, leaving the program prior to completion each time. Tr. at 52–53. Bliss was previously employed as

a dishwasher, salad maker, prep cook, and housekeeper in addition to working at a country club and multiple stints in the fast food industry. Tr. at 56, 61–62, 64–65, 221. Bliss alleges disability from diabetes, degenerative disc disease of the lower lumbar spine, high blood pressure, anxiety, depression, borderline personality disorder, high cholesterol, asthma, and lower back pain. *See* Tr. at 65, 95, 309.

2  "Tr." followed by a number refers to the pages of the administrative transcript filed by the Commissioner. Dkt. No. 13.

### B. Procedural History

**\*3** On November 8, 2010, Bliss protectively filed an application for social security disability insurance ("SSDI") and social security income ("SSI") benefits pursuant to the Social Security Act, 42 U.S.C. § 401 *et seq.* claiming an alleged onset date of July 1, 2005. Tr. at 188, 195. That application was denied on January 21, 2011. Tr. at 27, 101–06. Bliss requested a hearing before an administrative law judge ("ALJ"), John Ramos, which was held on April 12, 2012. Tr. at 43–92 (transcript of the administrative hearing). In a decision dated May 10, 2012, the ALJ found that Bliss was not entitled to disability benefits. Tr. at 27–38. Bliss's representative filed a timely request for review with the Appeals Council and on July 1, 2013, the request was denied, thus making the ALJ's findings the final decision of the Commissioner. Tr. at 1–5. This action followed.

### II. Discussion

### A. Standard of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam). Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004) (citing *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." *Barrinton v. Comm'r of Soc. Sec.,* 358 F.Supp.2d 67, 72 (N.D.N .Y.2005) (citing *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984)). However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Yancey v. Apfel,* 145 F.3d 106, 111 (2d Cir.1998). If the Commissioner's finding is supported by substantial evidence, it is conclusive. 42 USC § 405(g) (2006); *Halloran,* 362 F.3d at 31.

### B. Determination of Disability [3]

3  While the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably." *Donato v. Sec'y of Health and Human Servs.,* 721 F.2d 414, 418 n. 3 (2d Cir.1983) (citation omitted).

"Every individual who is under a disability shall be entitled to a disability ... benefit...." 42 U.S.C. § 423(a)(1) (2004). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience. *Id.* § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses, or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." *Ventura v. Barnhart,* No. 04–CV–9018(NRB), 2006 WL 399458, at \*3 (S.D.N.Y. Feb. 21, 2006) (citing *Mongeur v. Heckler,* 722 F.2d 1033, 1037 (2d Cir.1983)).

**\*4** The Second Circuit employs a five-step analysis, based upon 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his [or her] past work. Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Berry,* 675 F.2d at 467. The plaintiff bears the initial burden of proof to establish each of the first four steps. *DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998) (citing *Berry,* 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to

engage in gainful employment somewhere. *Id.* at 1180 (citing *Berry,* 675 F.2d at 467).

### C. ALJ Ramos's Findings

Bliss, accompanied by a non-attorney representative, testified at a hearing held on April 12, 2012. Tr. at 43–92. At the start of the hearing, Bliss's representative amended the alleged disability onset date to August 20, 2010. Tr. at 48. Using the five-step disability sequential evaluation, the ALJ found that Bliss: (1) had not engaged in substantial gainful activity since August 20, 2010; (2) had the following severe medically determinable impairments: degenerative disc disease of the lumbar spine, diabetes, and mood disorder; (3) did not have an impairment, alone or in combination, sufficient to meet the listed impairments in Appendix 1, Subpart P of Social Security Regulation Part 404; (4) maintains "the residual functional capacity [ ("RFC")] to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) ... but should avoid work requiring more complex interaction or joint effort to achieve work goals, and handle reasonable levels of simple, work-related stress in that he can make decision directly related to the performance of simple tasks in a position with consistent job duties that does not require [Bliss] to supervise or manage the work of others"; (5) could not perform past relevant work; and (6) given his age, education, work experience, and RFC, was able to perform a significant number of jobs in the national economy. *See* at Tr. 29–37. Therefore, a determination of not disabled was made. Tr. at 38.

### D. Bliss's Contentions

**\*5** Bliss first contends the ALJ's severity determination is inaccurate, incomplete, and not based on substantial evidence. Pl.'s Mem. at 15. Bliss next claims the ALJ did not fully develop the record. *Id.* at 17. Bliss then asserts the ALJ failed to follow the treating physician's rule. *Id.* at 18. Bliss next argues the RFC is inaccurate, incomplete, and not based upon substantial evidence. *Id.* at 20. Bliss then contends the ALJ's credibility determination is inaccurate and insufficient. *Id.* at 26. Lastly, Bliss argues the Commissioner failed to meet her burden to show other work Bliss can do based on his RFC. *Id.* at 28.

### 1. ALJ's Severity Determination

Bliss contends that the ALJ's determination of the severity of his impairments is not supported by substantial evidence. Pl.'s Mem. at 15. As mentioned above, step two of the sequential evaluation process requires a determination as to whether the claimant has a severe impairment which significantly limits the physical or mental ability to do basic work activities for a continuous period of time of not less than one year. *See* subsection II(B) *supra.* Thus, a diagnosis alone is insufficient to establish a severe impairment as, instead, the plaintiff must show that the medically determinable impairments significantly limit the ability to engage in basic work activities. 20 C.F.R. § 404.1521(b). The ability to do basic work activities is defined as "the abilities and activities necessary to do most jobs." *Id.* Basic work activities which are relevant for evaluating the severity of an impairment include:

(1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

*Id.; see also Pickering v. Chater,* 951 F.Supp. 418, 424 (S.D.N.Y.1996); Social Security Ruling ("SSR") 85–28, 1985 WL 56856, at *3–4 (S.S.A.1985).

Bliss's contends that because his depressive disorders, anxiety, anger, intermittent explosive disorder, and antisocial personality disorder have more than a *de minimis* effect on his ability to engage in substantial gainful activity, the ALJ should have included them in the severity discussion. Pl.'s Mem. at 15, 17. After a review of the record, this claim is found to be without merit. In fact, the ALJ did in fact address these non-exertional limitations. *See* Tr. at 29–30. The ALJ considered these limitations though he termed them collectively to be a "mood disorder" for the purpose of his analysis. *See*

*id.* The ALJ, in making his determination of Bliss's severe impairments, discussed the reports of Drs. Dubro and Carr, and concluded that mood disorders did list among Bliss's severe impairments. Tr. at 30. Thus, any dispute between Bliss and the ALJ on this point is a result of the ALJ's decision to consider all of Bliss's non-exertional limitations collectively termed as a mood disorder. Accordingly, the ALJ properly considered the severity of Bliss's depressive disorders, anxiety, anger, intermittent explosive disorder, and antisocial personality disorder.

**\*6** Bliss also claims that the ALJ failed to properly evaluate the severity of his pain and consider said pain as a severe impairment. Pl.'s Mem. at 15. This claim also fails. *See* 20 C.F.R. §§ 404.1528(a) ("Symptoms are your own description of your physical or mental impairment. Your statements alone are not enough to establish that there is a physical or mental impairment."), 404.1529(b) ("Your symptoms, such as pain ... will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."). Symptoms such as pain are to be considered by the ALJ in making a determination as to how a severe impairment may impact an individual's ability to engage in substantial gainful activity, but only when the symptoms are attributable to a medically-determinable physical or mental impairment. 20 C.F.R. § 404.1529(a). Such symptoms cannot be considered to be severe impairments independent of a medical condition to which they can be attributed. *See id.* The pain Bliss complained of was not a separate severe impairment, but, rather, Bliss's own perception of his degenerative disc disease of the lumbar spine. As such, the ALJ should only consider complaints of pain to the extent Bliss's degenerative disc disease alters Bliss's ability to engage in substantial gainful activity. Here, in the RFC discussion, the ALJ evaluated how Bliss's pain, in connection with the affect of degenerative disc disease, would have an impact on Bliss's ability to engage in substantial gainful activity. *See id.;* Tr. at 34–35.

As the ALJ properly considered Bliss's depressive disorders, anxiety, anger, intermittent explosive disorder, antisocial personality disorder, and pain, there was no error made in determining Bliss's severe impairments. Accordingly, the Commissioner's decision on this issue should be affirmed.

## 2. Development of the Record

An ALJ has an affirmative duty to develop the administrative record during Social Security hearings, even when the claimant is, as in this case, represented by counsel. *See Perez v. Chater,* 77 F.3d 41, 47 (2d Cir.1996) (citations omitted); *see also* 20 C .F.R. § 404.1512(d) (describing Commissioner's duty to develop a "complete medical history for at least the [twelve] months preceding the month in which [claimant] file[s an] application...."); 20 C.F.R. § 404.1512(e) (explaining how the Commissioner will attempt to retrieve the entire medical history from claimant's treating sources as opposed to always seeking consultative examinations). Accordingly, "[t]he ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence, the ALJ's own finding that the record is inadequate or the ALJ's reliance on an expert's conclusion that the evidence is ambiguous." *Webb v. Barnhart,* 433 F.3d 683, 687 (9th Cir.2005) (citation omitted); *see also Rosa v. Callahan,* 168 F.3d 72, 79 n. 5 (2d Cir.1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.") (citation omitted); *Roat v. Barnhart,* 717 F.Supp.2d 241, 264 (N.D.N.Y.2010) (holding that where a "medical record paints an incomplete picture of [claimant's] overall health during the relevant period, as it includes evidence of the problems, the ALJ had an affirmative duty to supplement the medical record, to the extent it was incomplete, before rejecting [claimant's] petition.") (internal quotation marks, altercations, and citation omitted).

**\*7** It appears Bliss was attempting to argue that the record was not fully developed because the ALJ did not consider his Wechsler Adult Intelligence Scale ("WAIS–IV") IQ score of 72. Pl.'s Mem. at 17–18. Bliss argues that his IQ score, in conjunction with his physical and mental disorders, may meet Listing 12.05C. *Id.;* POMS DI 24515.056 D.1.c.[4] However, this contention is without merit. In his decision, the ALJ gave reduced weight to the report completed by Dr. Moore, a psychologist, who administered the WAIS–IV test for Bliss. Tr. at 37, 361. This was because the ALJ found Dr. Moore's report to be inconsistent with the longitudinal medical evidence in the record and based primarily on Bliss's own reports. Tr. at 37.

[4]    Specifically,

> Listing 12.05C is based on a combination of an IQ score with an additional and significant mental or physical impairment.
>
> The criteria for this paragraph are such that a medical equivalence determination would very rarely be required. However, slightly higher IQ's (e.g., 70–75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination. It should be noted that generally the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found.
>
> POMS DI 24515.056 D.1.c.

With respect to inconsistencies, the ALJ noted several in his RFC determination. The ALJ noted Dr. Dubro, a consultative examiner, concluded that Bliss is able to follow, understand, attend to, and remember directions and instructions. Tr. at 35, 436–37. Dr. Dubro had also found that Bliss is able to perform daily and complex tasks independently on a regular basis and capable of making appropriate decisions. Tr. at 35, 437. The ALJ noted the opinions of the administration's psychiatric consultant, Dr. Mata, who found that Bliss's ability to remember locations and work-like procedures and to understand short and simple instructions was not significantly limited and that the ability to understand and remember detailed instructions was only moderately limited. Tr. at 36, 439. Moreover, Bliss has not cited to any medical evidence in the record to support his assertion that his IQ score of 72 renders him mentally deficient.[5] Any intellectual deficits were incorporated into the ALJ's RFC determination. Tr. at 33–34.

[5]    As noted *supra,* an IQ score of 72 falls in the slightly higher IQ range. *See* note 4 on Listing 12.05C. Further, Dr. Moore had assessed Bliss with a verbal/comprehension index of 83, perceptual/reasoning index of 73, working/memory index of 74, and processing/speed index of 76. Tr. at 360.

Despite the conflicting opinions, the ALJ determined that he could properly render a decision on the 271–page medical record. In his decision, an ALJ is not required to discuss every piece of evidence before him. *See Mongeur,* 722 F.2d at 1040 ("Where, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he ... have explained

why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion on disability") (citations omitted); *Miles v. Harris,* 645 F.2d 122, 124 (2d Cir.1981) ("Notwithstanding the apparent inconsistency between [two medical] reports ... we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony.").

It also appears that Bliss was attempting to contend the ALJ should have recontacted Dr. Moore after finding such inconsistencies. However, an ALJ is required to recontact a treating source only if the records received were inadequate to determine whether the claimant was disabled. *Perez,* 77 F.3d at 47. That is not the case here. "The mere fact that medical evidence is conflicting ... does not mean that an ALJ is required to re-contact a treating physician." *Micheli v. Astrue,* 501 F. App'x 26, 29 (2d Cir.2012). It is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such. *Id.* at 29–30. The ALJ weighs all evidence to determine whether a claimant is disabled based on the evidence before him or her. *See Richardson v. Perales,* 402 U.S. 389, 399 (1971) ("We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict."). As such the ALJ has adequately developed the administrative record and his determination was supported by substantial evidence. *See id.; Johnson* 312 F.Supp.2d at 426; *Rosa,* 168 F.3d at 82–83.

**\*8** Accordingly, the Commissioner's decision on this issue should be affirmed.

### 3. Treating Physician's Rule

When evaluating a claim seeking disability benefits, factors to be considered by the ALJ include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant. *Harris v. R.R. Ret. Bd.,* 948 F.2d 123, 126 (2d Cir.1991). Generally, more weight is given to a treating source. Under the regulations, a treating source's opinion is entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2) (2005); *Shaw v. Chater,* 221 F.3d 126, 134

(2d Cir.2000). "This rule applies equally to retrospective opinions given by treating physicians." *Campbell v.. Astrue,* 596 F.Supp.2d 445, 452 (D.Conn.2009) (citations omitted). Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons." *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.1998).

The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion: "(I) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." *Schaal,* 134 F.3d at 503. If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent the opinion is, the less weight it will be given. *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999) (citation omitted). Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner. *Id.* at 133–34; *see* 20 C.F.R. § 404.1527(e) (2005).

Bliss contends that the treating physician's rule was disregarded by the ALJ when the ALJ failed to assign controlling weight to the opinions of Dr. Carr, Bliss's treating mental health professional. *See* Pl.'s Mem. at 19–20. The ALJ did not assign controlling weight because of inconsistences between Dr. Carr's treatment notes and the report he provided to the ALJ. Tr. at 36. The ALJ, instead, assigned the report only "some weight" in recognition of Dr. Carr's long treatment history with Bliss. *Id.* Specifically, the ALJ points to Dr. Carr's treatment notes where Dr. Carr concludes that Bliss is "feeling better about life." Tr. at 428. Additionally, the treatment notes indicate that at times Bliss was well dressed and groomed (Tr. at 427) and overall achieving a higher level of functionality (*See* Tr. at 422) than Dr. Carr's report to the ALJ would indicate. *See* Tr. at 525. For the aforementioned reasons, the ALJ determined that Dr. Carr's report was not entirely credible and assigned it reduced weight. Tr. at 36.

**\*9** The ALJ also appears to have relied on consultant physician testimony in determining not to afford controlling weight to Dr. Carr's report. *See* Tr. at 36–37; *Mongeur,* 722 F.2d at 1039 (finding that "[i]t is an accepted principle that the opinion of a treating physician

is not binding if it is contradicted by substantial evidence and the report of a consultative physician may constitute such evidence.") (citations omitted). The ALJ notes that he assigns at least some weight to the reports of Drs. Mata, Dubro, Hare, and Moore. *See* Tr. at 36–37. In particular, the report of Dr. Mata, the administration's psychiatric consultant, is given relatively high weight because of "her programmatic expertise, review of the claimant's medical records, and the relative consistency of her opinions with the longitudinal medical evidence in the record." Tr. at 36. The ALJ used these competing evaluations to conclude that Dr. Carr's testimony was not worthy of controlling weight because it was not supported by other substantial evidence.

As there exists substantial evidence to support the ALJ's decision to not assign controlling weight to Dr. Carr's opinions, the ALJ did not err in failing to apply the treating physician's rule. *See Halloran,* 362 F.3d at 31; *Berry,* 675 F.2d at 467. Accordingly, the Commissioner's decision on this issue should be affirmed.

### 4. RFC

Bliss contends that the ALJ's RFC determination was not supported by substantial evidence and the ALJ had improperly applied the regulations. RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations beyond the symptoms. *Martone v. Apfel,* 70 F.Supp.2d 145,150 (N.D.N.Y.1999); 20 C.F.R. §§ 404.1545, 416.945. "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient." *Martone,* 70 F.Supp.2d at 150. RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy. *New York v. Sullivan,* 906 F.2d 910, 913 (2d Cir.1990); 20 C.F.R. §§ 404.1545, 416.960 (2003). The Second Circuit has clarified that, in Step 5 of the Commissioner's analysis, once RFC has been determined "the Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's [RFC]." *Pourpre v. Astrue,* 566 F.3d 303, 306 (2d Cir.2009).

Each finding as to the plaintiff's functional abilities must be supported by substantial evidence because conclusory statements regarding plaintiff's capacities are not sufficient ... Only after the ALJ has described the plaintiff's capabilities on a function-by-function basis supported by substantial evidence may RFC then be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

*\*10 DiVetro v. Comm'r of Soc. Sec.,* No. 05–CV–830 (GLS/DEP), 2008 WL 3930032, at *2 (N.D.N.Y. Aug. 21, 2008) (internal quotation marks and citations omitted).

Under the regulations, if a claimant's symptoms suggest a greater severity of impairment than supported by the objective medical evidence, other factors will be considered, including: daily activities; the location, duration, frequency, and intensity of pain and other symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; treatment, other than medication, received for relief of symptoms; any measures used to relieve symptoms; and other factors concerning functional limitations due to the symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). However, statements about a claimant's pain or symptoms alone are not enough to establish a disability. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

The ALJ determined that Bliss retained the RFC

to perform sedentary work ... in that [Bliss] is able to lift and/or carry ten pounds occasionally and less than ten pounds frequently, stand and/or walk for two hours in an eight-hour workday, and sit for six hours in an eight-hour workday. Additionally, [Bliss] retains the ability to understand and follow simply instructions and directions, perform

simple tasks with supervision and independently, maintain attention and concentration for simple tasks, regularly attend to a routine and maintain a schedule, relate to and interact appropriately with others to the extent necessary to carry out simple tasks but should avoid work requiring more complex interaction or joint effort to achieve work goals, and handle reasonable levels of simple, work-related stress in that he can make decision[s] directly related to the performance of simple tasks in a position with consistent job duties that does not require the claimant to supervise or manage the work of others.

Tr. at 34–35.

Bliss first contends that the RFC does not consider how his exertional limitations limit his ability to consistently perform an activity. According to SSR 96–9P and POMS DI 25015.020,

**Standing and walking:** The full range of sedentary work requires that an individual be able to stand and walk for a total of approximately 2 hours during an 8–hour workday. If an individual can stand and walk for a total of slightly less than 2 hours per 8–hour workday, this, by itself, would not cause the occupational base to be significantly eroded.

...

**Sitting:** In order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8–hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2–hour intervals. If an individual is unable to sit for a total of 6 hours in an 8–hour work day, the unskilled sedentary occupational base will be eroded.

**\*11** ...

The fact that an individual cannot do the sitting required to perform the full range of sedentary work

does not necessarily mean that he or she cannot perform other work at a higher exertional level.

...

**Alternate sitting and standing:** An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing.

SSR 96–9P, 1996 WL 374185, at \*6–7 (S.S.A. July 2, 1996). Bliss further cites to SSR 83–12, under which an individual who may sit for a time but must get up and stand or walk before returning to sitting is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work or the prolonged standing or walking contemplated for most light work. SSR 83–12, 1983 WL 31253 (S.S.A.1983).

Bliss maintains that he is incapable of performing prolonged siting or standing; thus, his occupational base is limited. With respect to his subjective complaints, Bliss contends that physical pain prevents him from standing for longer than fifteen minutes and sit for longer than thirty minutes before having to change positions. Tr. at 254. Bliss notes that he has reported difficulty standing and sitting, suffers from back pain, experiences pain radiating from lower back to both legs. Tr. 286, 304, 307–08, 318, 324, 327, 330. Furthermore, in March 2006, a treating physician noted that Bliss could not stand for more than one hour at a time. Tr. at 307.

Here, the ALJ's RFC determination on Bliss's exertional limitations is supported by substantial evidence. The ALJ noted that Dr. Magurno, a consultative internal medicine examiner, had opined Bliss shows marked limitations for lifting and carrying, moderate limitations for walking and squatting, and mild limitations for standing. Tr. at 35, 433. Dr. Magurno further opined that Bliss had no limitations for sitting and fine motor activity. Tr. at 35, 433. As for gait and station, Dr. Magurno found Bliss to have a slow gait but can stand on heels and toes, squat half way

down, had a normal stance, did not use assistive devices, did not require assistance with changing for the exam or getting on and off the exam table, and had mild difficulty rising from a chair. Tr. at 431. Dr. Magurno found that Bliss's cervical spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. Tr. at 432. Bliss's lumbar spine flexion was limited to forty degrees but had full extension, lateral flexion bilaterally, and full rotary movement bilaterally. Tr. at 432. Bliss has full range of movement for in the shoulder, elbows, forearms, wrists, knees, ankles, and hip except for flexion limited to ninety degrees bilaterally. Tr. at 432. The above medical evidence constitutes substantial evidence supporting the ALJ's RFC determination that Bliss can lift or carry ten pounds occasionally and less than ten pounds frequently, stand or walk for two hours in an eight-hour workday, and sit for six hours in an eight-hour workday. *Pennay v. Astrue,* No. 05–CV–0673 (FJS/ DEP), 2007 WL 5465987, at *7 (N.D.N.Y. Aug. 3, 2007) ("The opinions of a consultative examiner can provide substantial evidence to support an ALJ's determination.") (citing *Barringer v. Comm'r of Soc. Sec.,* 358 F.Supp.2d 67, 79 (N.D.N.Y.2005)* (Sharpe, J.) (indicating that state agency consultative examiners "are qualified as experts in the evaluation of medical issues in disability claims. As such their opinions may constitute substantial evidence if they are consistent with the record as a whole.")).

 **\*12** Furthermore, the ALJ noted that Bliss has reported going camping, swimming, fishing, and drinking water from a waterfall. Tr. at 35, 376. The ALJ further noted that Bliss has little or no recent treatment for back pain. Tr. at 35. Bliss reported to Dr. Magurno that he cooks five times a week, cleans once or twice a week, does laundry once a month, shops once a month, carries out childcare each day, and dresses daily. Tr. at 430. As such, the ALJ has considered Bliss's daily activities as well as the types of treatment received for alleviating symptoms. *20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Rivera v. Harris,* 623 F.3d 212, 216 (2d Cir.1980)* ("[Plaintiff's] testimony showed that despite her pains and shortness of breath, she can cook, sew, wash and shop, so long as she does these chores slowly and takes an afternoon rest. Taken as a whole, appellant's testimony did not preclude the possibility that she could perform gainful activity of a light, sedentary nature").

Bliss next contends that the RFC does not consider how his social functioning limitations affect his ability

to consistently perform an activity. Bliss contends that he has great difficulty in socializing with other people, becomes nervous around people, and has drastic mood changes, anger, and depression. Tr. 56–7, 59–60, 62, 72. Bliss contends that the ALJ disregarded his difficulty with concentration, which limits his persistence and pace. Bliss asserts that he stays at home, watches television, and is easily confused and frustrated. Bliss further points to his GAF scores, which range from 45 to 55 between November, 2008, and January, 2012. Tr. 505, 535.

In this case, the ALJ's RFC determination on Bliss's social functioning is supported 20 by substantial evidence. The ALJ noted that Dr. Dubro, a consultative examiner, opined that Bliss can follow, understand, attend to, and remember directions and instructions. Tr. at 35, 436–37. Dr. Dubro concluded Bliss only has mild limitations with attention, concentration, learning new tasks, regularly attend to a routine, and maintain a schedule and moderate limitations in interacting with others. Tr. at 35, 437. Further, Dr. Dubro found that Bliss can perform daily and complex tasks independently on a regular basis and is capable of making appropriate decisions. Tr. at 35, 437. Dr. Dubro also noted that "[u]ntil recently, [Bliss] had been attending GED preparation classes [but] stopped attending reportedly because he could not find someone to watch his daughter during the time that he was at the class." Tr. at 434. This was not due to any social functioning limitation. Finally, with regard to GAF scores, defendant points out that in November 2010, Bliss was given a GAF score of 59, an increase from 50 in May, 2008. Tr. 422, 426. In short, the social functioning portion of the ALJ's RFC determination is supported by the above substantial evidence.

Accordingly, the Commissioner's decision on this issue should be affirmed.

### 5. Credibility Determination

 **\*13** "The ALJ has discretion to assess the credibility of a claimant's testimony regarding disabling pain and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979). If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with his impairments

is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi). The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of her symptoms are consistent with the objective medical and other evidence. See SSR 96–7p, 1996 WL 374186, at *2 (SSA 1996). One strong indication of credibility of an individual's statements is their consistency, both internally and with other information in the case record. SSR 96–7p, 1996 WL 274186, at *5 (SSA 1996).

After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony. Saxon v. Astrue, 781 F.Supp.2d 92, 105 (N.D.N.Y.2011) (citing 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)). An ALJ rejecting subjective testimony must do so explicitly and with specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence. Melchior v. Apfel, 15 F.Supp.2d 215, 219 (N.D.N.Y.1998) (quoting Brandon v. Bowen, 666 F.Supp. 604, 608 (S.D.N.Y.1987) (citations omitted)). The Commissioner may discount a plaintiff's testimony to the extent that it is inconsistent with medical evidence, the lack of medical treatment, and his own activities during the relevant period. Howe–Andrews v. Astrue, No. CV–05–4539 (NG), 2007 WL 1839891, at *10 (E.D.N.Y.2007). The ALJ must also consider whether "good reasons" exist for failing to follow the prescribed treatment, e.g. religious objections, lack of ability to pay, significant risks associated with treatment. SSR 82–59; see also Grubb v. Apfel, No. 98 CIV. 9032(RPP), 2003 WL 23009266, at *4–8 (S.D.N.Y.2003). The ALJ determines issues of credibility and great deference is given his judgment. Gernavage v. Shalala, 882 F.Supp. 1413, 1419, n. 6 (S.D.N.Y.1995).

The ALJ gave reduced weight to Bliss's statements regarding the degree to which he was limited by his disorders, stating: "the [ALJ] finds that [Bliss's] ... impairments could reasonably be expected to cause the alleged symptoms; however, [Bliss's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not fully credible." Tr. at 35. To support his decision, the ALJ cites numerous occasions where Bliss would act contrary to the symptoms he claimed to be experiencing, both mentally and physically. See id. With respect to Bliss's mental impairments, the ALJ concluded "[Bliss] appears only to treat his mental health issues when motivated by probation or a social service agency monitoring his ability to care for his daughter." Id. Bliss admitted to Dr. Greggo that he had been off of his psychotropic medication for multiple weeks while Dr. Greggo indicated that it was likely longer. Tr. at 476. Rite Aid Pharmacy confirmed that Bliss had not filled various mental health prescriptions in approximately four months, seven months, and two years. See Tr. at 476.

*14 Concerning Bliss's physical impairments, the ALJ also determined that Bliss's actions contradicted his assertions on the level to which his physical impairments actually impeded his ability to work. See Tr. at 35. While Bliss testified that he had severe physical limitations including being unable to drive due to back pain (Tr. at 50), having to take a ten-minute break when climbing ten to fifteen stairs (Tr. at 50–51), being unable to stand while working without regular breaks to sit (Tr. at 57, 61–63), and being unable to bend (Tr. at 64), the ALJ noted that some of Bliss's actions contradict these claims. See Tr. at 35. The ALJ specifically mentions Bliss's admission to Dr. Greggo that he was considering engaging in sexual activity and that he had recently gone fishing, camping, swam in a lake, and drank from a waterfall. See Tr. at 35, 368, 376. The ALJ concludes his discussion by noting "[Bliss's] criminal record and poor work history over the years demonstrates a weak attachment to the work force, which detract from his credibility regarding motivation to work." Tr. at 35.

Given the ALJ's discussion on Bliss's hearing testimony, medication, activities of daily living, and ability to work, substantial evidence exists supporting the ALJ's determination of Bliss's credibility. See Halloran, 362 F.3d at 31; Berry, 675 F.2d at 467. As such, the ALJ did not err in assessing Bliss's credibility and Bliss's motion on this ground should be denied. Accordingly, the Commissioner's decision on this issue should be affirmed.

### 6. Commissioner's Burden

Lastly, Bliss claims that the Commissioner failed to meet her step-five burden. Pl.'s Mem. at 28. Under the Social Security Act, the Commissioner bears the burden of proof for the final determination of disability. *Pratt v. Chater,* 94 F.3d 34, 38 (2d Cir.1996). Generally speaking, if a claimant suffers only from exertional impairments, then the Commissioner may satisfy his burden by resorting to the applicable grids. [6] *Pratt,* 94 F.3d at 39. The grids "take[ ] into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience." *Rosa,* 168 F.3d at 79. Ordinarily, the ALJ need not consult a vocational expert, and may satisfy this burden "by resorting to the applicable medical vocational guidelines (the grids)." *Id.* at 78 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2).

[6]     An "exertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (i.e. sitting, standing, walking, lifting, carrying, pushing, and pulling). 20 C.F.R. §§ 404.1569a(b), 416.969a(b); *see also Rodriguez v. Apfel,* 1998 WL 150981, at *10, n. 12 (S.D.N.Y.1998).

The Second Circuit has held that "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert or preclude reliance" on the grids. [7] *Bapp v. Bowen,* 802 F.2d 601, 605 (2d Cir.1986). The testimony of a vocational expert that jobs exist in the economy which claimant can obtain and perform is required only when "a claimant's nonexertional impairments significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines." *Id.* The use of the phrase "significantly diminish" means the "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id.* at 606. Under these circumstances, to satisfy his burden at step five, the Commissioner must "introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform ." *Rosa,* 168 F.3d at

78 (quoting *Bapp,* 802 F.2d at 604). Therefore, when considering nonexertional impairments, the ALJ must first consider the question—whether the range of work the plaintiff could perform was so significantly diminished as to require the introduction of vocational testimony. *Samuels v. Barnhart,* No. 01 Civ. 3661(MBM), 2003 WL 21108321, at *12 (S.D.N.Y.2003) (holding that the regulations require an ALJ to consider the combined effect of a plaintiff's mental and physical limitations on his work capacity before using the grids).

[7]     A "nonexertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Examples of nonexertional limitations are nervousness, inability to concentrate, difficulties with sight or vision, and an inability to tolerate dust or fumes. 20 C.F.R. §§ 404.1569a(a), (c)(i), (ii), (iv), (v), 416.969a(a), (c)(i), (ii), (iv), (v); *see also* Rodriguez, 1998 WL 150981, at * 10, n. 12.

**\*15** The ALJ should elicit testimony from the expert by posing hypothetical questions. If a hypothetical question does not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability. *Milligan v. Chater,* No. 94–CV–944S, 1996 WL 1015417, at *8 (W.D.N.Y.1996). The "[p]roper use of vocational testimony presupposes both an accurate assessment of the claimant's physical and vocational capabilities, and a consistent use of that profile by the vocational expert in determining which jobs the claimant may still perform." *Lugo v. Chater,* 932 F.Supp. 497, 503 (S.D.N.Y.1996). Further, there must be "substantial evidence to support the assumption upon which the vocational expert based his opinion." *Dumas v. Schweiker,* 712 F.2d 1545, 1554 (2d Cir.1983).

Here, Bliss claims the RFC assessment that he can perform unskilled sedentary work is flawed because the ALJ discounted certain treating and examining physicians' opinions. As discussed *supra,* the ALJ's RFC analysis was supported by substantial evidence. There is no support for Bliss's contention that he suffered from additional impairments that were improperly omitted from the RFC. Further, Bliss has not set forth any other argument with respect to the ALJ's assessment at step five of the

sequential analysis. Thus, the Court concludes that the ALJ's decision is supported by substantial evidence.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that the Commissioner's decision denying disability benefits be **AFFIRMED** and Bliss's motion for judgment on the pleadings (Dkt. No. 17) be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Date: August 8, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 457643

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1123477
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Frederick Paul PETELL, Jr., Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY, Defendant.

No. 7:12–CV–1596 (LEK/CFH).
|
Signed March 21, 2014.

**Attorneys and Law Firms**

Conboy, McKay Law Firm—Carthage Office, Lawrence D. Hasseler, Esq., of Counsel, Carthage, NY, for Plaintiff.

Hon. Richard S. Hartunian, United States Attorney for the Northern District of New York, Vernon Norwood, Esq., Special Assistant United States Attorney, of Counsel, Syracuse, NY, for Defendant.

*ORDER*

LAWRENCE E. KAHN, District Judge.

**\*1** This is an action for judicial review of the Social Security Administration's ("SSA") decision denying Plaintiff Frederick Paul Petell, Jr. ("Plaintiff") disability benefits. The matter comes before the Court following a Report–Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3 filed on February 28, 2014, by the Honorable Christian F. Hummel, U.S. Magistrate Judge, affirming the SSA's decision. Dkt. No. 26 ("Report–Recommendation").

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." FED. R. CIV. P. 72(b); L.R. 72.1(c). "If no objections are filed ... reviewing courts should review a report and recommendation for clear error." Edwards v. Fischer, 414 F.Supp.2d 342, 346–47 (S.D.N.Y.2006); see also Cephas v. Nash, 328 F.3d 98, 107 (2d Cir.2003) ("As a rule, a party's failure to object to any purported error or omission in

a magistrate judge's report waives further judicial review of the point."); Farid v. Bouey, 554 F.Supp.2d 301, 306 (N.D.N.Y.2008).

No objections to the Report–Recommendation were filed within the allotted time period. See generally Docket. The Court has conducted a thorough review of the record and the Report–Recommendation and finds no clear error.

Accordingly, it is hereby:

**ORDERED,** that the Report–Recommendation (Dkt. No. 26) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED,** that the Social Security Administration's decision is **AFFIRMED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION AND ORDER** [1]

[1]   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff Frederick Paul Petell, Jr. ("Petell") brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for benefits under the Social Security Act. Compl. (Dkt. No. 1). Petell moves for a finding of disability and the Commissioner cross-moves for a judgment on the pleadings. Dkt. Nos. 12, 15. For the following reasons, it is recommended that the Commissioner's decision be affirmed.

**I. Background**

### A. Facts

Born May 18, 1971, Petell was thirty-seven years old when he applied for disability benefits. Tr. at 128. [2] Petell attended special education classes but was expelled from ninth grade. Tr. at 39–40, 138. Petell can read and write English. Tr. at 132. Petell was previously employed as a herdsman, linesman, and a construction worker. Tr. at 40, 200. Petell alleges disability from dyslexia, migraines stemming from a brain injury, and mental health issues. Tr. at 133.

[2]     "Tr." followed by a number refers to the pages of the administrative transcript filed by the Commissioner. Dkt. No. 8.

### B. Procedural History

**\*2** Petell protectively filed an application for supplemental security income ("SSI") benefits on January 28, 2009 and social security disability insurance ("SSDI") benefits on February 1, 2009 pursuant to the Social Security Act, 42 U.S.C. § 401 et seq. claiming an alleged onset date of September 1, 2008. Tr. at 16, 128. That application was denied on June 5, 2009. Tr. at 16, 62–68. Petell requested a hearing before an administrative law judge ("ALJ"), Marie Greener, which was held on July 27, 2010. Tr. at 69–70, 34–60 (transcript of the administrative hearing). In a decision dated September 14, 2010, the ALJ found that Petell was not entitled to disability benefits. Tr. at 16–27. Petell's counsel filed a timely request for review with the Appeals Council and on August 24, 2012, the request was denied, thus making the ALJ's findings the final decision of the Commissioner. Tr. at 1–9. This action followed.

### II. Discussion

### A. Standard of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam). Substantial evidence is "more than a mere scintilla," meaning that in the record one can

find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004) (citing *Richardson v. Perales,* 402 U.S. 389, 401 (1971)) (internal quotation marks omitted).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." *Barringer v. Comm'r of Soc. Sec.,* 358 F.Supp.2d 67, 72 (N.D.N .Y.2005) (citing *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984)). However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Yancey v. Apfel,* 145 F.3d 106, 111 (2d Cir.1998). If the Commissioner's finding is supported by substantial evidence, it is conclusive. 42 U.S.C. § 405(g) (2006); *Halloran,* 362 F.3d at 31.

### B. Determination of Disability [3]

[3]     While the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably." *Donato v. Sec'y of Health and Human Servs.,* 721 F.2d 414, 418 n. 3 (2d Cir.1983) (citation omitted).

"Every individual who is under a disability shall be entitled to a disability ... benefit...." 42 U.S.C. § 423(a)(1) (2004). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience. *Id.* § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints

of pain or disability, and educational background, age, and work experience." *Ventura v. Barnhart,* No. 04–CV–9018(NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006)[4] (citing *Mongeurv. Heckler,* 722 F.2d 1033, 1037 (2d Cir.1983)).

[4]     All Social Security Rulings and unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

 **\*3** The Second Circuit employs a five-step analysis, based upon 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work. Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines

whether there is other work which the claimant could perform.

*Berry,* 675 F.2d at 467. The plaintiff bears the initial burden of proof to establish each of the first four steps. *DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998) (citing *Berry,* 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere. *Id.* at 1180 (citing *Berry,* 675 F.2d at 467).

### C. ALJ Greener's Findings

Petell, represented by counsel, testified at a hearing held on July 27, 2010. Tr. at 16–27. In addition, Petell's wife, Eva Petell, also testified. *Id.* Using the five-step disability sequential evaluation, the ALJ found that Petell: (1) had not engaged in substantial gainful activity since September 1, 2008, the alleged onset date; (2) had severe medically determinable impairments of gastroesophageal reflux disease ("GERD")[5] and intermittent explosive disorder ("IED");[6] (3) did not have an impairment, alone or in combination, sufficient to meet the listed impairments in Appendix 1, Subpart P of Social Security Regulation Part 404; (4) maintains "the residual functional capacity [ ("RFC") ] to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c)[7] except no more than occasional contact with supervisors, co-workers, or the public"; (5) could not perform past relevant work; and (6) given his age, education, work experience, and RFC, was capable of engaging in employment which exists in significant numbers in the national economy. Tr. at 18–27. Therefore, a determination of not disabled was made.

[5]     "Gastroesophageal reflux" refers to the "reflux of the stomach and duodenal contents into the esophagus, which may sometimes occur normally ... or as a chronic pathological condition." DORLAND'S ILLUSTRATED MED. DICTIONARY 1439 (28th ed.1994) [hereinafter "DORLAND'S"].

[6]     Intermittent explosive disorder is a behavioral disorder characterized by repeated episodes of impulsive, aggressive, violent behavior or angry verbal outbursts in which the individual reacts grossly out of proportion to the situation. *Intermittent Explosive Disorder: Definition,*

MAYO CLINIC, http://www.mayoclinic.com/he alth/intermittent-explosive-disorder/DS00730 (last visited Feb. 28, 2014).

7      *"Medium work* involves lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20. C.F.R § 416.967(b).

### D. Petell's Contentions

**\*4** Petell first contends that the ALJ failed to assess the severity of his migraine headaches and lower back pain. Petell next contends that the ALJ's RFC assessment was erroneous because she improperly applied the treating physician's rule, failed to recontact a treating source, failed to afford weight to the opinions of Petell's social worker, and failed to support it with substantial evidence. Petell then asserts that the ALJ improperly evaluated Petell's credibility. Petell next contends that the ALJ failed to apply the psychiatric review technique ("PRT") required for evaluating mental impairments. Lastly, Petell claims that the ALJ failed to support the Step 5 conclusion with substantial evidence.

### 1. Severity

As mentioned above, step two of the sequential evaluation process requires a determination as to whether the claimant has a severe impairment which significantly limits the physical or mental ability to do basic work activities for a continuous period of time of not less than one year. *See* subsection II(B) *supra.* Thus, a diagnosis alone is insufficient to establish a severe impairment as instead, the plaintiff must show that the medically determinable impairments significantly limit the ability to engage in basic work activities. 20 C.F.R. § 404.1521(b). The ability to do basic work activities is defined as "the abilities and activities necessary to do most jobs." *Id.* Basic work activities which are relevant for evaluating the severity of an impairment include:

(1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

*Id.; see also Pickering v. Chater,* 951 F.Supp. 418, 424 (S.D.N.Y.1996); *see also* Social Security Ruling ("SSR") 85–28, 1985 WL 56856, at \*3–4 (S.S.A.1985).

### i. Migraine Headaches

Petell argues substantial evidence shows that his migraine headaches impose at least more than a minimal limitation. Pl.'s Mem. of Law (Dkt. No. 12) at 12. Since a syncopal episode [8] in November 2007, Petell asserts he has consistently sought treatment for headaches. *Id.* Petell notes that in April 2009, he was referred to a consultative examiner ("C E") and neurologist, Dr. Harbinder Toor ("Toor"), M.D., who opined that Petell's "headaches can interfere with [Petell's] daily routine." Tr. at 289. However, Dr. Toor does not specify how such migraine headaches significantly limit Petell's ability to do basic work activities. 20 C.F.R. § 404.1521(b). Further, Dr. Toor's opinion was not based on any medical exams but solely on Petell's statements, which contradict other treatment notes of record. Tr. at 287, 289. Petell next notes that, in August 2008, Petell advised his treating source Richard Edwards ("Edwards"), RPA–C, a registered physician assistant, that he was having approximately two headaches each week. Tr. at 264. Additionally, Petell points to treatment notes dated December 2011 where Edwards noted Petell's continued headaches despite modification to his medication. Tr. at 443–44.

8      A "syncope" is "a faint or swoon." DORLAND'S at 1622.

**\*5** Despite the above record evidence indicating that Petell has had migraines since November 2007, the ALJ's finding that Petell's migraines were non-severe are supported by substantial evidence. Tr. at 18. The ALJ expanded on this conclusion at length. The ALJ noted that objective medical evidence, namely CT scans, revealed Petell's syncopal episode was likely caused by migraines

without aura. Tr. at 212–13, 219, 222. The ALJ considered contrary evidence, namely that Petell advised Neurologist Dr. Edward J. Mazdzer, M.D. ("Mazdzer") in October 2008 that he had no headaches since November 2007 but reported to Dr. Toor in April 2009 that he had daily headaches. Tr. at 258, 287. In December 2007, Edwards noted that Petell has a history of prior migraines but they had been dormant and placed Petell on Nadolol to treat the headaches. [9] Tr. at 238.

[9]    Nadolol is a beta-blocker that is used to treat chest pains, high blood pressure, and other conditions as determined by a physician. Available at http://www.drugs.com/cdi/nadolol.html (last visited Feb. 27, 2014).

The ALJ cited 2008 treatment notes indicating that Petell's headaches were stable and under control. Tr. at 18–19. In April 2008, Petell reported to Edwards that he had "no headaches whatsoever." Tr. at 241. On July 22, 2008, Petell reported to Edwards having no headaches since November 2007 and Petell was advised to avoid driving and climbing until seen by a neurologist. Tr. at 239. As Petell noted, the ALJ also considered that on August 20, 2008, Petell claimed he had approximately two headaches each week though that were "very mild," "not associated with weakness, dizziness, faintness, loss of consciousness, numbness, tingling, or any visual disturbances," and "usually respond[ed] to Tylenol." Tr. at 243, 264. Petell claimed a "little dizziness" when he stood up from a chair, although the dizziness was transient, mild, and dissipated after a few seconds. Tr. at 243. Edwards concluded that Petell's migraines were stable. Tr. at 244. The ALJ further noted that in October 2008, Dr. Mazdzer concluded that Petell "could safely operate a motor vehicle and return to work without restrictions." Tr. at 258.

The ALJ next cited 2009 treatment notes also indicating that Petell's migraine headaches were controlled. In February 2009, Petell reported to Edwards that he had no syncopal episodes, severe headaches, or other problems. Tr. at 247. In May 2009, Petell reported to Edwards that he was having several headaches per week and was prescribed Topamax. [10] Tr. at 249–50. In June 2009, Petell advised Edwards that the Topamax gave him some morning drowsiness but had no headaches. Tr. at 251. In July 2009, Petell reported fainting and vomiting while lifting weights. Tr. at 253. As a result, Petell's Nadolol dosage was decreased and was advised to refrain from

exercising over the weekend only. Tr. at 253. Petell was also diagnosed with symptomatic bradycardia [11] that was likely induced in part by valsalva maneuver [12] and the Topamax dosage was increased. Tr. at 253–54. In August 2009, Petell continued to have syncopal symptoms and vomiting when lifting heavy weights during his workouts but had no headaches. Tr. at 255. These symptoms were absent when conducting other activities. *Id.* Thus, Petell was advised to find another exercise method, take Nadolol and Topamax, and avoid heavy lifting. *Id.*

[10]    "Topamax (topiramate) is a seizure medication ... also used to prevent migraine headaches in adults. It will only prevent migraine headaches or reduce the number of attacks. It will not treat a headache that has already begun." Available at http://www.drugs.com/topamax.html (last visited Feb. 28, 2014).

[11]    "Bradycardia" is the "slowness of the heartbeat." DORLAND'S at 223.

[12]    "Valsalva maneuver" refers to "forcible exhalation effort against a closed glottis ... interfer[ing] with venous return to the heart." *Id.* at 985.

**\*6** Lastly, the ALJ noted that recent treatment notes, ranging from December 5, 2007 through January 13, 2010, reveal that Petell's migraines were under control. Tr. at 19, 238–55, 259–70, 293–95, 345–50, 373–80. The ALJ concluded no record evidence shows that Petell's migraines imposed significant-related restrictions and no such evidence was provided from Petell's treating source. Tr. at 19. Additionally, in January 2012, Petell reported to Edwards that his headaches were "adequately controlled with current medications." Tr. at 445.

Given the above relevant record evidence dated November 2007 through December 2011 where there were only two changes to Petell's medications, a reasonable mind could accept as adequate to support the ALJ's conclusion that Petell's migraine headaches were not sufficiently severe to significantly limit Petell's ability to engage in basic work activities. *Halloran,* 362 F.3d at 31. Further, the Second Circuit has found that an ALJ's error at step two is not reversible error if the ALJ found other severe impairments and proceeded beyond step two. *Stanton v. Astrue,* 370 F. App'x 231, 233 n. 1 (2d Cir.2010). Here, the ALJ found Petell had severe medically determinable impairments of GERD and IED. Furthermore, the ALJ expressly considered the "combination of impairments" in

making her determination of not disabled. *Stanton,* 370 F. App'x at 233 n. 1. Moreover, the ALJ discussed Petell's headaches at length in her RFC assessment. Tr. at 25. *Spina v. Colvin,* No. 11–CV–1496, 2014 WL 502503, at *4 (N.D.N.Y. Feb. 7, 2014) ("[B]ecause the ALJ found that plaintiff had the severe impairment of neurocardiogenic syncope, he continued to consider plaintiff's disability under Steps Three through Five of the disability analysis. Even if it had been error to find plaintiff's migraines to be a nonsevere impairment, the error would have been harmless."). Thus, any error in finding Petell's migraine headaches to be non-severe would be merely harmless.

Accordingly, the Commissioner's decision on this issue should be affirmed.

### ii. Lower Back Pain

Petell next contends that substantial evidence shows his lower back pain imposes at least more than a minimal limitation. Pl.'s Mem. of Law at 13. In December 2010, Petell was referred for physical therapy where his reduced lumbar flexion and extension were noted. Tr. at 420–21. In March 2011, Dr. John Savage, M.D., an orthopedic surgeon, noted that a compression examination caused pain and tenderness in the lower back and an x-ray showed wedging of T11, suggesting a compression fracture. Tr. at 437–38. In April 2011, Petell was diagnosed with a "fairly high-grade foraminal narrowing at L4–5 and L5–SI due to combination of disk bulging and facet hypertrophy." Tr. at 440. Readings of a MRI dated April 2012 showed "broad-based disk bulges at all lumber levels L1 through L5–S1," with "the most significant foraminal narrowing ... at L4–L5." Tr. at 450. Petell was referred to a specialist Dr. Craig T. Montgomery, M.D. who noted that steroid injections, aggressive physical therapy, pain management, and nonsteroidal anti-inflammatories failed to control the condition. Tr. at 450.

*7 Defendant did not address this issue with good reason. As the Appeals Council noted, the ALJ could not have addressed Petell's medical records relating to lower back pain because that condition, and any relevant medical records concerning the condition, was raised for the first time after the ALJ issued her decision on September 14, 2010. *See* Tr. at 420 (noting that in December 2010, while at work, a bull struck Petell's lower back, causing him lower back pain). The Appeals Council

is only obligated to consider new and material evidence that relates to the period on or before the date of the ALJ hearing decision. *Shrack v. Astrue,* 608 F.Supp.2d 297, 302 (D.Conn.2009) (citing *Perez v. Chater,* 77 F.3d 41, 45 (2d Cir.1996); 20 C.F.R. § 404.970(b)). Thus, the Appeals Council correctly explained, "[w]e found that some of the evidence was after the [ALJ's] decision.... If you want us to consider whether you were disabled after September 14, 2010, you need to apply again. We are returning the evidence to you to use in your new claim." Tr. at 2.

Accordingly, the Commissioner's decision on this issue should be affirmed and any arguments pertaining to Petell's purported lower back condition will not be further addressed in this Report–Recommendation.

### 2. RFC

The ALJ determined that Petell retained the RFC "to perform medium work ... except no more than occasional contact with supervisors, co-workers, or the public." Tr. at 21. Petell contends that the ALJ erred when she failed to: (1) apply the treating physician's rule to the opinions of psychiatrist Dr. M.U. Saleem, M.D. and recontact Dr. Saleem for further development of the record; (2) afford proper weight to social worker Bob Bower's opinions; and (3) support her RFC assessment with substantial evidence. Defendant did not specifically address the first two issues in her motion papers.

### i. Treating Physician's Rule and Recontact

When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant. *Harris v. R.R. Ret. Bd.,* 948 F.2d 123, 126 (2d Cir.1991). Generally, more weight is given to a treating source. Under the regulations, a treating source's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2) (2005); *Shaw,* 221 F.3d at 134. "This rule applies equally to retrospective opinions given by treating physicians." *Campbell v.. Astrue,* 596 F.Supp.2d 445, 452 (D.Conn.2009) (citations omitted). Before a

treating physician's opinion can be discounted, the ALJ must provide "good reasons." *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.1998).

The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." *Schaal,* 134 F.3d at 503. If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent the opinion is, the less weight it will be given. *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999). Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner. *Id.* at 133–34; *see* 20 C.F .R. § 404.1527(e) (2005).

**\*8** Petell contends that Dr. Saleem's opinions should have been given controlling weight. Dr. Saleem saw Petell in January 2009 and noted that Petell had IED and a history of anger management problems; however, Petell did not receive any mental health treatment for it since 1997. Tr. at 259. Petell was appropriately dressed with good hygiene, cooperative, coherent, and in a positive mood. Tr. at 250. Petell's memory was intact, attention and concentration were fair, insight and judgment were fair, and denied suicidal/homicidal ideations and hallucinations. *Id.* Dr. Saleem evaluated Petell with a Global Assessment of Functioning ("GAF") 65. [13] Tr. at 260.

[13]  GAF rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupational functioning. A GAF in the range of 61 to 70 indicates "[s]ome mild symptoms (*e.g.,* depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (*e.g.,* occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Zabala v. Astrue,* 595 F.3d 402, 405 (2d Cir.2010) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM–IV"), at 34 (4th ed. rev.2000)).

In August 2009, Dr. Saleem and Bob Bowser ("Bowser"), a licensed social worker, provided a medical source

statement ("MSS") for Petell based on sessions between January 14, 2009 and August 26, 2009. Tr. at 334. Dr. Saleem concluded that Petell's IED slightly affected Petell's ability to understand, remember, or carry out short and simple instructions. *Id.* Petell's ability to make judgments on simple work-related decisions was moderately affected. *Id.* Petell's ability to understand, remember, and carry out detailed instructions were severely impaired. *Id.* The MSS continued, noting that Petell's ability to interact appropriately with the public, supervisors, and co-workers was slightly affected. Tr. at 335. Petell's ability to respond appropriately to work pressures and changes in a routine work setting was markedly affected. *Id.*

Petell contends that Dr. Saleem's opinions are uncontradicted. To the extent that this argument references Dr. Saleem's diagnoses of IED, this is true. This is recognized by the ALJ who found the impairment to be severe in her analysis. Tr. at 18. There is no question that the psychiatric and neurological consultations and psychological review indicated Petell's complaints of IED. Tr. at 287. Rather, the ALJ disagreed with Dr. Saleem's ultimate opinion regarding Petell's ability to work. This is well within the ALJ's province. SSR 96–5P, 1996 WL 374183, at \*1 (S.S.A.1996) (explaining that determinations of disability are reserved for the Commissioner and to the extent a treating source comments on that issue, such commentary is "never entitled to controlling weight or special significance."); *see also Taylor v. Barnhart,* 83 F. App'x 347, 349 (2d Cir.2003) (explaining that a treating physician's opinion about disability "is not entitled to any weight, since the ultimate issue of disability is reserved for the Commissioner.") (citing 20 C.F.R. § 404.1527(d)(1) & *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999)).

To be entitled to controlling weight, the treating physician's opinion must be well supported by medically acceptable evidence and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2) (2005); *Shaw,* 221 F.3d at 134. The ALJ first stated that "[w]hile [Petell] claims a history of treatment for [IED], he was seen in January 2009 for the first time [by Dr. Saleem] since his prior treatment in 1997." Tr. at 25. The ALJ noted Petell had a GAF 65, which is mild. *Id.* The ALJ found Dr. Saleem's opinion of extreme and marked limitations were unpersuasive because that opinion was not substantially supported by other evidence of record,

and in a less persuasive manner, only supported by Dr. Saleem and Bowser's treatment notes. Tr. at 25. The ALJ further noted that despite Petell's allegation that he had always had difficulty getting along with others, he held jobs for fairly long periods of time, one of which for at least two years. Tr. at 25, 43, 200.

**\*9** During the psychiatric consultation dated April 18, 2009, CE and Psychiatrist Dr. Dennis M. Noia, Ph.D., noted that Petell was responsive and cooperative to questions and was calm, relaxed, and comfortable. Tr. at 282–83. Dr. Noia further noted that Petell's attention and concentration was intact. Tr. at 282. Petell's recent and remote memory skills were mildly impaired as he could recall three objects immediately and two after five minutes and restate four digits forward and three digits backward. Tr. at 283. Petell reported that he had no history of psychiatric hospitalizations and got along with friends and family. Tr. at 281, 283. Petell could regularly dress, bathe, groom himself, prepare food, do general cleaning, laundry, shopping, manage money, and take public transportation. Tr. at 283. Dr. Noia gave Petell a fair prognosis. Tr. at 284.

During the neurological consultation dated April 18, 2009, CE and Neurologist Dr. Harbinder Toor, M.D. noted that Petell had no indication of impairment in recent or remote memory, insight, or judgment and Petell's mood and affect were appropriate. Tr. at 288. Petell reported that he showers, bathes, dresses, cooks, cleans, and does laundry on a daily basis. *Id.*

On May 12, 2009, medical consultant and reviewing psychologist Dr. H. Ferrin concluded that there was no evidence that Petell was limited in his ability to understand, remember, and carry out detailed instructions. Tr. at 312. Petell's ability to work with others without being distracted was not significantly limited. *Id .* Petell's ability to respond appropriately to changes in the work setting was moderately limited. Tr. at 313.

Drs. Noia, Toor, and Ferrin are specialists and medical consults. The opinions of medical consults like Drs. Noia, Toor, and Ferrin may constitute substantial evidence.

> It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consults, since

> such consultants are deemed to be qualified experts in the field of social security disability. Such reliance is particularly appropriate where ... the opinions of these ... State agency medical consultants are supported by the weight of the evidence.

*See Fiozzo v. Barnhart,* No. 05–CV–561 (LEK/VEB), 2011 WL 677297, at \*8 (N.D.N.Y. Jan. 19, 2011) (citations omitted); *see also Diaz v. Shalala,* 59 F.3d 307, 313 n. 5 (2d Cir.1995) (explaining that "the opinions of nonexamining sources [can] override treating sources' opinions provided they are supported by evidence in the record.") (citations omitted); *McEaney v. Comm. of Soc. Sec.,* 536 F.Supp.2d 252, 256 (N.D.N.Y.2008) ("the evaluations of non-examining State agency medical and psychological consultants may constitute substantial evidence ... An ALJ must treat such evaluations as expert opinion evidence of non-examining sources ... This treatment extends to ... RFC assessments [because] ... [s]tate agency consultants are experts in evaluating the medical issues of disability claims.") (citations omitted). The record does show that Petell received medical and therapeutic treatment for IED from Dr. Saleem and Bowser. Tr. at 167, 334. But the record also shows that despite Petell's continued claim that he had always had anger management problems, he never exhibited outbursts at any visit with a medical personnel from as early as November 2007. The ALJ "is entitled to rely not only on what the record says, but also on what it does not say." *Dumas v. Schweiker,* 712 F.2d 1545, 1553 (2d Cir.1983) (citations omitted). The record fails to support such sweeping and broad restrictions as Dr. Saleem has proffered. As such, given Dr. Saleem's opinions were inconsistent with other substantial record evidence, the ALJ did not err in declining to apply the treating physician's rule to the opinions of Dr. Saleem.

**\*10** Accordingly, the Commissioner's decision on this issue should be affirmed.

### b. Failure to Develop the Record

An ALJ has an affirmative duty to develop the administrative record during Social Security hearings, even when the claimant is, as in this case, represented by counsel. *See Perez v. Chater,* 77 F.3d 41, 47 (2d

Cir.1996) (citations omitted); *see also* 20 C .F.R. § 404.1512(d) (describing Commissioner's duty to develop a "complete medical history for at least the [twelve] months preceding the month in which [claimant] file[s] an] application...."); 20 C.F.R. § 404.1512(e) (explaining how the Commissioner will attempt to retrieve the entire medical history from claimant's treating sources as opposed to always seeking consultative examinations). Accordingly, "[t]he ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence, the ALJ's own finding that the record is inadequate or the ALJ's reliance on an expert's conclusion that the evidence is ambiguous." *Webb v. Barnhart,* 433 F.3d 683, 687 (9th Cir.2005) (citation omitted); *see also Rosa v. Callahan,* 168 F.3d 72, 79 n. 5 (2d Cir.1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.") (citation omitted); *Roat v. Barnhart,* 717 F.Supp.2d 241, 264 (N.D.N.Y.2010) (holding that where a "medical record paints an incomplete picture of [claimant's] overall health during the relevant period, as it includes evidence of the problems, the ALJ had an affirmative duty to supplement the medical record, to the extent it was incomplete, before rejecting [claimant's] petition.") (internal quotation marks, altercations, and citation omitted).

Petell argues that to the extent Dr. Saleem's opinion was unsupported or inconsistent with the record, the ALJ was required to recontact Dr. Saleem for further development of the medical opinion. An ALJ is required to recontact a treating source only if the records received were inadequate to determine whether the claimant was disabled. *Perez,* 77 F.3d at 47. That is not the case here. "The mere fact that medical evidence is conflicting ... does not mean that an ALJ is required to re-contact a treating physician." *Micheli v. Astrue,* 501 F. App'x 26, 29 (2d Cir.2012). It is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such. *Id.* at 29–30. The ALJ weighs all evidence to determine whether a claimant is disabled based on the evidence before her. *See Richardson v. Perales,* 402 U.S. 389, 399 (1971) ("We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict.").

In this case, despite the conflicting opinions, the ALJ properly determined that she could render a decision on the 245–page medical record. The ALJ found inconsistency among the opinions Dr. Saleem and other medical evidence of record. *See Mongeur v. Heckler,* 722 F.2d 1033, 1040 (2d Cir.1983) ("Where, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he ... have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion on disability") (citations omitted); *Miles v. Harris,* 645 F.2d 122, 124 (2d Cir.1981) ("Notwithstanding the apparent inconsistency between [two medical] reports ... we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony.").

**\*11** Accordingly, the Commissioner's decision on this issue should be affirmed.

### c. Weight Accorded to "Other Source"

Petell concedes that Bowser is not "an acceptable medical source" but argues that the ALJ had a duty to evaluate his opinion pursuant to SSR 06–03P. *Saxon v. Astrue,* 781 F.Supp.2d 92, 103 (N.D.N.Y.2011) (citation omitted). Social Security Ruling 06–03P provides, "[i]n addition to evidence from 'acceptable medical sources,' we may use evidence from "other sources," ... to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06–03P, 2006 WL 2329939, at \*2 (S.S.A.2006). A social worker is defined as "other sources." *Id.* While information from an "other source" cannot be employed to establish a medically determinable impairment, it may provide insight into the severity of an impairment and how it affects a claimant's ability to work. *Id.* In weighing such opinions, the ALJ uses the same factors as those of "acceptable medical sources." *Saxon,* 781 F.Supp.2d at 104 (citing *inter alia* 20 C.F.R. § 404.1527(d)). The ALJ may conclude that a licensed social worker's opinion is not entitled to any weight but must provide an explanation for that decision. *Id.*

The ALJ did not fail to consider Bowser's opinions. Although the Social Security Regulation provides that the ALJ should explain the weight given to an "other source," the ALJ need only "ensure[ ] that the discussion of the evidence in the determination or decision

allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." SSR 06–03P, 2006 WL 2329939, at *6. Here, the ALJ referred to Bowser's opinions in the RFC assessment. The ALJ first noted an April 2009 report of contact where Bowser indicated that Petell began counseling treatments with him in January 2009 for depressive order and anger management. Tr. at 23, 167, 342–44. Bowser reported that he was not qualified to evaluate the extent of Petell's issues with memory. Tr. at 23, 167. The ALJ proceeded to discuss the MSS that Bowser had co-signed. Tr. at 24. As discussed *supra*, the ALJ took issue solely with the severe and marked limitations given in the MSS because they are not supported by other evidence of record. "Courts conducting judicial review in social security cases do not require perfect opinions or rigid, mechanical, formulaic applications of governing legal principles." *Abdulsalam v. Comm'r of Soc. Sec.,* No. 12–CV–1631 (MAD), 2014 WL 420465, at *5 (N.D.N.Y. Feb. 4, 2014) (citation omitted). As such, "despite the lack of specific weight assigned to the opinions, the Court is able to discern with ease the ALJ's reasoning, and [her] treatment of the evidence will not be disturbed ." *Id.* (citation omitted).

Accordingly, the Commissioner's decision on this issue should be affirmed.

### d. Substantial Evidence

Petell contends that the ALJ's RFC determination was not supported by substantial evidence. RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations beyond the symptoms. *Martone v. Apfel,* 70 F.Supp.2d 145,150 (N.D.N.Y.1999); 20 C.F.R. §§ 404.1545, 416.945. "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient." *Martone,* 70 F.Supp.2d at 150. RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy. *New York v. Sullivan,* 906 F.2d 910, 913 (2d Cir.1990); 20 C.F.R. §§ 404.1545, 416.960 (2003). The Second Circuit has clarified that, in Step 5 of the Commissioner's analysis, once RFC has been determined "the Commissioner need only show that there is work in the national economy that the claimant can do; he need

not provide additional evidence of the claimant's [RFC]." *Pourpre v. Astrue,* 566 F.3d 303, 306 (2d Cir.2009).

> **\*12** Each finding as to the plaintiff's functional abilities must be supported by substantial evidence because conclusory statements regarding plaintiff's capacities are not sufficient ... Only after the ALJ has described the plaintiff's capabilities on a function-by-function basis supported by substantial evidence may RFC then be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

*DiVetro v. Comm'r of Soc. Sec.,* No. 05–CV–830 (GLS/DEP), 2008 WL 3930032, at *2 (N.D.N.Y. Aug. 21, 2008) (internal quotation marks and citations omitted).

Petell first contends that the ALJ erred by failing to ascribe work-related limitations based on Petell's IED. However, the ALJ did incorporate IED limitations into Petell's RFC assessment. Namely, the ALJ concluded that Petell is limited to medium work that cannot have more than occasional contact with supervisors, co-workers, or the public. This is supported by substantial evidence. Dr. Saleem and Bowser opined that Petell had only slight limitations in interacting appropriately with the public, supervisors, and co-workers. Tr. at 335. Dr. Noia observed that Petell was responsive, cooperative, and his manner of relating, social skills, and overall presentation was adequate, and he appeared to be able to relate to and interact moderately well with others. Tr. at 282, 284. Further, Dr. Ferrin opined that Petell had no significant limitations in working in coordination with or proximity to other people, interacting appropriately with the general public, getting along with co-workers, and maintaining socially appropriate behavior. Tr. at 312–13. Thus, this contention is without merit.

Petell next contends that the RFC does not incorporate limitations imposed by Petell's GERD and migraine headaches. This is inaccurate. The RFC assessment discussed Petell's GERD. Tr. at 24. The ALJ noted that Petell was diagnosed with GERD, esophageal stricture,

and gastritis. Tr. at 24, 367, 380–81. The ALJ noted that Edwards had treated Petell's GERD and limited him to no heavy lifting or weightlifting. Tr. at 25, 253. There is no other record evidence indicating limitations imposed by the GERD. The ALJ's RFC assessment also discussed Petell's migraine headaches, noting Petell's claim that he was having migraines more frequently. Tr. at 22. The ALJ stated that Petell received treatment for migraines, which became stable with medication. Tr. at 23. Petell saw Dr. Mazdzer in October 2008, who opined that Petell's neurological and cerebellar examinations were normal; thus, he could safely drive and return to work without restrictions. Tr. at 23, 245. A neurological consultative examination in April 2009 showed that Petell was having daily headaches. Tr. at 24, 323. In August 2009 and April 2010, Petell reported to Edwards that his headaches were controlled. Tr. at 24, 255, 375. As previously discussed, the relevant medical records largely indicate that Petell's headaches are controlled with medication. Ultimately, the ALJ found that "the medical records [relevant to migraine headaches] do not corroborate the frequency or intensity" as alleged. Tr. at 25. Accordingly, the ALJ did incorporate GERD and migraine headaches conditions into the RFC where appropriate and, where she disagreed, namely with respect to the frequency and intensity of the migraine headaches, she identified and outlined why.

**\*13** The ALJ found that Petell could perform medium work with occasional contact with supervisors, co-workers, and the public. Medium work consists of lifting no more than fifty pounds at a time with frequent lifting or carrying objects weighing up to twenty-five pounds. 20 C.F.R § 416.967(b). The record does not show that Petell has any exertional limitations. There is no record evidence indicating that Petell was ever in acute distress at any doctor's appointment. In July 2009, Petell reported to Edwards that he was lifting weights with Bowflex, specifically doing curls and bench presses. Tr. at 253. In October 2008, Dr. Mazdzer reported that Petell's motor exam and gait were normal and that Petell could safely operate a motor vehicle. Tr. at 257. In April 2009, Dr. Toor observed that Petell's gait and station were normal and a tandem walk from heel to toe was normal. Tr. at 288. Petell required no assistance to change for the exam, could rise from a chair without difficulty, had intact hand and finger dexterity, and had a grip strength of 5/5 bilaterally. *Id.* Further, Petell's range of motion throughout the body was normal. *Id.* Given the above relevant evidence, a

reasonable mind might accept is adequate to support the ALJ's RFC assessment. *Halloran,* 362 F.3d at 31.

Accordingly, the Commissioner's decision on this issue should be affirmed.

### 3. Petell's Credibility

The ALJ determines whether an ailment is an impairment based on a two-part test. First, the ALJ must decide, based upon objective medical evidence, whether "there [are] medical signs and laboratory findings which show ... medical impairment(s) which could reasonably be expected to produce [such] pain...." *Barringer v. Comm'r of Soc. Sec.,* 358 F.Supp.2d 67, 81 (N.D.N.Y.2005); 20 C.F.R. § 404.1529 (2003). This primary evaluation includes subjective complaints of pain. 20 C.F.R. § 404.1529 (2003). " 'Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.' " *Barringer,* 358 F.Supp.2d at 81 (quoting *Crouch v. Comm'r of Soc. Sec. Admin.,* No. 01–CV–0899 (LEK/GJD), 2003 WL 22145644, at \*10 (N.D.N.Y. Sept. 11, 2003).

An ALJ must consider all symptoms, including pain, and the extent to which these symptoms are consistent with the medical and other evidence. 20 C.F.R. § 404.1529 (2003). "Pain itself may be so great as to merit a conclusion of disability where a medically ascertained impairment is found, even if the pain is not corroborated by objective medical findings." *Rivera v. Schweiker,* 717 F.2d 719, 724 (2d Cir.1983) (citing *Gallagher v. Schweiker,* 697 F.2d 82, 84 (2d Cir.1983)). However, "disability requires more than mere inability to work without pain." *Dumas v.. Schweiker,* 712 F.2d 1545, 1552 (2d Cir.1983). Pain is a subjective concept "difficult to prove, yet equally difficult to disprove" and courts should be reluctant to constrain the Commissioner's ability to evaluate pain. *Dumas v. Schweiker,* 712 F.2d 1545, 1552 (2d Cir.1983). In the event there is "conflicting evidence about a [claimant's] pain, the ALJ must make credibility findings." *Snell v. Apfel,* 177 F.3d 128, 135 (2d Cir.1999) (citing *Donato v. Sec'y of HHS,* 721 F.2d 414, 418–19 (2d Cir.1983)). Thus, the ALJ may reject the claims of disabling pain so long as the ALJ's decision is supported by substantial evidence. *Aponte v. Sec'y of HHS,* 728 F.2d 588, 591 (2d Cir.1984).

**\*14** The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged pain and the degree to which it hampers the applicant's ability to engage in substantial gainful employment. *See Marcus v.. Califano,* 615 F.2d 23, 27 (2d Cir.1978). The ALJ must consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

(i) [The claimant's] daily activities;

(ii) The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate ... pain or other symptoms;

(v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of ... pain or other symptoms;

(vi) Any measures [the claimant] use[s] or ha[s] used to relieve ... pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

Petell contends that the ALJ's credibility determination is unsupported by substantial evidence. In this case, the ALJ found that while Petell had severe impairments, Petell's allegations of disability were not credible. Tr. at 24–25.

Petell contends that Dr. Toor indicated his migraines could interfere with his daily routine. However, as the ALJ noted and the records reflect, Petell is able to substantially perform activities of daily living. Tr. at 20, 25. The ALJ repeatedly noted that Petell's medical notes show his migraine headaches are well controlled by medication. Tr. at 18–19, 25. *Dumas v. Schweiker,* 712 F.2d 1545, 1552–53 (2d Cir.1983) ("Although [plaintiff] now complains of severe debilitating headaches, headaches did not factor significantly into any of the medical opinions concluding that [plaintiff] was unable to return to his

prior employment .... Moreover, there is evidence ... that Bufferin helped to relieve the pain.").

Petell also contends that Dr. Saleem's opinion with respect to extreme and marked limitations constitutes substantial evidence of IED's limitations on Petell's work abilities. However, substantial evidence consisting of the opinions of Drs. Noia, Toor, and Ferrin, as previously discussed, support the ALJ's determination that Petell's IED is not as disabling as Petell alleged. Further, the ALJ noted that Petell was seen for the first time in January 2009 for IED since 1997. Tr. at 25. Furthermore, the ALJ found that, despite Petell's assertion that he did not get along with other people and did not like taking orders, Petell was able to work for extended periods of time. Tr. at 25, 43. Petell also testified that he got along with his family. Tr. at 25, 50. Moreover, the ALJ recognized that not once did Petell had an outburst at a doctor's exam or appointment. Tr. at 25. Rather, the records show that Petell was always cooperative and responsive. Additionally, Petell testified that his temper tantrums consists of swearing at times and throwing a hammer but was never violent. Tr. at 52. As discussed *supra,* Dr. Saleem's opinions of severe and marked limitations were not substantially supported by other evidence of record.

**\*15** As for Petell's credibility with respect to GERD, the ALJ noted that Petell experienced faintness and vomiting after exercising and lifting heavy weights. Tr. at 25, 253. The ALJ did not dismiss this impairment; rather, there is an absence of medical records indicating that the affects of Petell's GERD was disabling or severe. Given the above relevant evidence, a reasonable mind might accept that the ALJ's credibility finding is adequately supported. *Halloran,* 362 F.3d at 31.

Accordingly, the Commissioner's decision on this issue should be affirmed.

### 4. Psychological Review Technique ("PRT")

As previously stated, in order to be considered disabled, a claimant must suffer from either a medically determinable physical or mental impairment. 42 U.S.C. § 1382(a)(3) (A). When evaluating a mental impairment, there is a "special technique" outlined in 20 C.F.R. § 404.1520a which requires consideration of four areas of potential limitation: "[a]ctivities of daily living; social functioning;

concentration, persistence, or pace; and episodes of decompensation." *Id.* § 1520a(c)(3). Where evidence of a colorable mental impairment has been proffered, failure to engage in the "special technique" generally requires remand. *Kohler v. Astrue,* 546 F.3d 260, 266–69 (2d Cir.2008); *see also Moore v. Barnhart,* 405 F.3d 1208, 1214 (11th Cir.2005) ("holding that where a claimant has presented a colorable claim of mental impairment, the social security regulations require the ALJ to complete ... [the special technique]. Failure to do so requires remand.") (citations omitted).

In the written decision, an ALJ:

> must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4). "Current regulations do not require completion of the Psychiatric Review Technique Form ... by the ALJ, but do require that his or her decision document application of the special technique." *Echandy– Caraballo v. Astrue,* No. CA 06–97M, 2008 WL 910059, at *3 (D.R.I. Mar. 31, 2008) (citing 20 C.F.R. § 404.1520a(e)(2)).

As an initial matter, Petell first contends that the ALJ should have considered that Petell suffers from IED. In this case, the ALJ concluded that Petell's IED constituted a severe medically determinable impairment though it did not meet or equal one of the impairments listed in the regulations. Thus, the record belies this contention.

Petell argues that the ALJ failed to properly apply PRT for evaluating Petell's IED by assigning him only modest limitations based on a limited review of the evidence. Here, the ALJ included in her decision specific findings as to

the degree of limitation in each of the four functional areas. The ALJ stated that Petell had mild restriction in activities of daily living ("ADL") for Petell had no problems with ADL and enjoyed fishing. Tr. at 20. The ALJ cited to Petell's ADL report, which indicates that Petell fed and walked two dogs, had no difficulties with handling personal hygiene, performed light lawn work, and occasionally handled laundry and household chores. Tr. at 153–54. Furthermore, the ALJ accurately noted in her RFC assessment that Petell testified he "goes into his shed and putters" and "helps around the house." Tr. at 22, 50–51. The ALJ next stated that Petell had moderate difficulties in social functioning. Tr. at 20. The ALJ noted that while Petell alleged he had more explosive episodes, the record showed that he was cooperative at all his examinations. *See, e.g.,* Tr. at 238–55. Petell was calm, relaxed, and comfortable at the CE examination. Tr. at 314–15. The ALJ took this into consideration in Petell's RFC, concluding that Petell should be limited to occasional contact with supervisors, co-workers, or the public. Tr. at 20. The ALJ next stated that Petell had mild difficulties in concentration, persistence, or pace. Tr. at 21. The ALJ noted that Petell did not shop but could handle money. Tr. at 21, 283. The ALJ noted while Petell alleged difficulties with memory, attention, and concentration, an April 2009 neurologic examination was unremarkable without indication of recent or remote memory impairment. Tr. at 21, 288. Further, the CE psychiatric examination showed that Petell's attention and concentration were intact. Tr. at 21, 74. Thus, Petell's allegations were not supported by the mental status examination findings. Tr. at 21. Finally, the ALJ noted Petell had no episodes of decompensation. *Id.*

**\*16** Given the ALJ's specific ratings and findings on each of the four functional areas, which are bolstered by evaluations from medical personnel who evaluated Petell, it cannot be said that the ALJ failed to carry out PRT analysis. *Cf. Kohler,* 546 F.3d at 267 (finding the ALJ failed to include specific findings with respect to each functional area).

Petell next contends that the ALJ's rating of Petell's functional limitations was inconsistent because the ALJ first stated that Petell's mental health imposed mild and moderate restrictions but later concluded that Petell's mental health would impose little or no effect on his ability to work. Tr. at 26. However, as the ALJ expressly explained, the first limitations identified were "used to

rate the severity of mental impairments at steps 2 and 3" and were not a RFC assessment for steps four and five. Tr. at 21. The RFC assessment requires consideration of "the combined effect of ... impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F .R. § 404.1523. Furthermore, "the functional capacity to perform medium work represents such substantial work capability at even the unskilled level that a finding of disabled is ordinarily not warranted in cases where a severely impaired person retains the functional capacity to perform medium work." 20 C.F.R. Part 404, Subpart P, App'x 2, § 2003.00(b). Accordingly, the ALJ's findings were not inconsistent.

Petell further contends that (1) the ALJ failed to credit Dr. Saleem's conclusions extreme and marked limitations, which are supported by Bowser and (2) the resulting informed listings analysis was flawed because of the alleged failure to apply the PRT. As discussed *supra*, because the ALJ's RFC assessment is supported by substantial evidence and the ALJ did not fail to properly apply the PRT, these arguments are rendered moot.

Finally, Petell contends that RFC assessment does not incorporate the moderate limitations as she determined the IED to have on Petell's ability to work. However, the ALJ incorporated such limitations when she limited Petell's medium work base to occasional contact with supervisors, co-workers, and the public. As such, Petell's contentions with respect to the PRT analysis are without merit.

Accordingly, remand is not necessary and the Commissioner's decision on this issue should be affirmed.

### 5. Use of the Grids

The ALJ then conducted her Step Five analysis. The ALJ may apply the Grids or consult a vocational expert ("VE"). *See Heckler v. Campbell,* 461 U.S. 458, 462 (1983); *Rosa v. Callahan,* 168 F.3d 72, 78 (2d Cir.1999); 20 C.F.R. pt. 404, subpt. P, App. 2 (2003). "For a claimant whose characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he is disabled." *Pratts v. Chater,* 94 F.3d 34, 38–39 (2d Cir.1996). However, "where the claimant's work capacity is significantly diminished beyond that caused by his [or

her] exertional impairment, the application of the grids is inappropriate," as the Grids do not take into account nonexertional impairments. *Bapp v. Bowen,* 802 F.2d 601, 605–06 (2d Cir.1986) (citations omitted). In this case, Petell contends that using the Grids was inappropriate and a vocational expert needed to be called regarding the effects of his migraine headaches and GERD.

**\*17** "[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guideline," rather such is "a case-by-case" determination considering whether the guidelines adequately reflect a claimant's abilities or whether nonexertional impairments constitute such a significantly limiting factor that other testimony is required. *Bapp v. Bowen,* 802 F.2d 601, 603, 605 (2d Cir.1986). As explained *supra,* no further testimony was required. Petell's migraine headaches were documented to have been well controlled, despite his testimony indicating otherwise. Furthermore, the record is devoid of any incident where Petell had an outburst from IED or any episode that affected his ability to work. As noted, the ALJ is entitled to rely on what the record does not say. *Dumas v. Schweiker,* 712 F.2d 1545, 1553 (2d Cir.1983) (citations omitted). These limitations do not constitute a significant diminishment of Petell's capacities so that his non-exertional impairments precluded the ALJ from using the Grids.

Accordingly, while the non-exertional limitations were considerations which the ALJ included in the RFC, further testimony was not required because the impairments did not significantly diminish Petell's abilities to the point where a vocational expert was required.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that the Commissioner's decision denying disability benefits be **AFFIRMED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v.*

*Sec'y of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: Feb. 28, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1123477

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.